No. 102,570

ELIZABETH SHIRLEY, as Mother and Next Friend of ZEUS
GRAHAM, *Appellant*, v. IMOGENE GLASS, BAXTER SPRINGS GUN
& PAWN SHOP, and JOE and PATSY GEORGE, *Appellees*.

(308 P.3d 1)

Opinion filed July 19, 2013.

*James R. Shetlar*, of Law Offices of James R. Shetlar, P.A., of Overland Park, and *Jonathan E. Lowy*, of the Brady Center To Prevent Gun Violence, of Washington, D.C., argued the cause and were on the briefs for appellant.

*Scott C. Nehrbass*, of Foulston Siefkin LLP, of Overland Park, argued the cause, and *James D. Oliver*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

ROSEN, J.: This appeal addresses a civil proceeding following the tragic murder of a child by his father and the father's subsequent suicide. The child's mother brought an action in negligence against the parties who provided the father with the murder weapon. This court is called upon to decide two narrow legal questions that are related to general principles of negligence.

The case was decided in district court on summary judgment. Reviewing the evidence in the light most favorable to the non-moving party, we find that the facts are as follows:

Zeus Graham was born to Elizabeth Shirley on July 3, 1995. Russell Graham was Zeus' father, as well as the father of an older boy, Alexander, by a different mother. Imogene Glass was Russell's grandmother and Zeus' great-grandmother.

Russell had a criminal history that included convictions of attempted rape and attempted kidnapping. Glass was aware of her grandson's convictions and had heard from Russell that he was not allowed to possess weapons. Glass was also aware that her grandson had a hot temper and that he tended to lose control of himself when he was angry. His bad temper manifested itself in violence

towards Shirley, which included punching her on multiple occasions, slapping her, and hitting her with a baseball bat.

On July 23, 2003, Russell called Shirley at work and summoned her to pick up Zeus from his house. When Shirley arrived, Russell accused her of infidelity and struck her numerous times on her jaw, arm, and chest. Russell told Shirley that if she screamed, the last thing that the boys would hear would be the sound of him killing her. Shirley filed a request for and received a protection from abuse order on that same day.

On August 22, 2003, Shirley brought Zeus to Russell's house for visitation. Before going into the house, Russell whispered to Shirley that if she did not move back in with him by the next day, he would kill Zeus. Shirley went to the police station and reported the threat. That weekend, Russell attempted to suffocate Zeus while the boy was sleeping, but the attack was not fatal.

Around the time that Kansas dove-hunting season opened in the fall of 2003, Russell told Glass—his grandmother—that Zeus and Alexander wanted to learn how to hunt doves and go hunting with their friends. On September 5, 2003, Russell called Glass to suggest going with her to purchase a gun for the boys. He promised Glass that the gun would be kept at her house and that he would not have possession of the gun.

Later that day, Glass and Russell drove in her car to Baxter Springs Gun & Pawn Shop. They had not been to the pawn shop before, and the owners, Joe and Patsy George, were not acquainted with them. Patsy had previously been a party to a telephone conversation with a man who asked about shotguns and said he wanted to purchase a single-shot shotgun so that he could take his child dove hunting. Glass and Russell went into the pawn shop together. When they entered the shop, Russell told Joe that he had called and there was a shotgun that he wanted to see. Russell told Joe that he would be paying for the gun.

Glass went to the back of the pawn shop and up to the gun counter, held the shotgun, and ordered ammunition and a gun-cleaning kit. Both Russell and Glass told the Georges that the shotgun was a gift for children. Joe then handed the shotgun to Russell,

who examined the gun and said that it looked nice and would be all right.

Joe asked Russell, "Have you been a good boy?" Russell said no and told Joe that he had a felony conviction. (Joe denied that this conversation, reported by Glass, took place.) Joe then said to Glass, "Let's see if grandma has been a good girl." Joe later explained that the reason for asking the question was to lighten the mood with a joke, while Patsy explained that the question was not a joke but was intended to determine whether a purchaser could legally buy a gun.

Glass filled out portions of Form 4473, writing her name in as the transferee or buyer of the gun. By signing the form, she acknowledged that she was the "actual buyer of the firearm(s)" listed on the form. The form also contained a notice stating: "Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you." The form further explained: "You are also the actual buyer if you are acquiring the firearm(s) as a legitimate gift for a third party." In addition, the form stated that the signatory understood that the purchase of a firearm on behalf of another person is a felony. Glass did not read the form that she signed or fill in the yes/no questions because, in her view, she was not purchasing the gun. Glass passed a background check and was given information on youth gun safety.

Russell then pulled cash from his pocket and declared that he was going to pay for the shotgun, the ammunition, and the cleaning kit. He either handed the money to Patsy or gave the money to Glass to give to Patsy. Russell picked up the shotgun and left the store with it in his hands. He had a receipt for the purchase when he and Glass returned to the car. A video camera that monitored the store apparently malfunctioned on the date of the transaction and failed to record the circumstances of the sale.

Russell took the gun from Glass' car when she dropped him off at his house. At about 11:50 that evening, Russell called Shirley and told her that Glass had helped him obtain a shotgun that day. He said that if she came over to his house and talked with him, she and Zeus would leave alive, but that if she did not come over

or if anyone else came over, he would shoot Zeus. He added that he would shoot himself that night in either event.

Shirley then called a friend, who instructed her to stay at home until he got there. He then called the police. Shirley called Russell back and left a message on his answering machine saying that she was on her way over. At around that same time, Russell shot and killed Zeus and then shot and killed himself.

On August 3, 2005, Shirley filed a petition in district court seeking damages in tort. Count I of the petition raised a claim of negligent entrustment and breach of a fiduciary duty on the part of Glass. Count II asserted that the pawn shop and the Georges negligently sold a firearm to a party while knowing that it was intended for another and without performing a background check on the intended owner. The defendants all filed an answer, and the pawn shop and the Georges moved for summary judgment.

On March 13, 2008, the district court entered an order granting the pawn shop and the Georges' motion for summary judgment on all theories. The order made findings consistent with K.S.A. 60-2102(c), relating to interlocutory appeals. On March 31, 2008, Shirley filed a timely notice of appeal. Shirley failed, however, to file an application for interlocutory appeal with the Court of Appeals, and the Court of Appeals dismissed the appeal as interlocutory.

Shirley then filed a motion to dismiss with prejudice her claims against Glass, asserting both that Glass had been diagnosed with Alzheimer's disease and that dismissal was appropriate in order to obtain finality of judgment. The district court granted the motion, subject to the reservation that the remaining defendants would not be barred from comparing Glass' fault. The order disposed of all claims and all parties and was final for purposes of appeal. Shirley filed a renewed notice of appeal.

On October 8, 2010, the Court of Appeals filed a decision affirming the district court's rejection of the negligence per se claim but reversing the district court's rejection of the negligent entrustment claim on summary judgment. *Shirley v. Glass*, 44 Kan. App. 2d 688, 241 P.3d 134 (2010).

Shirley filed a petition for review with this court seeking review of the decision with respect to negligence per se and the degree

of the defendants' duty of care in the simple negligence action. This court granted the petition.

*The Impact of Statutory Prohibitions on Selling Firearms to Felons*

The first question that we take up is whether the district court erred in denying Shirley's claim grounded in negligence per se.

Shirley's petition stated a theory of negligence against the pawn shop and its owners based on their act of selling a firearm while knowing that the purchaser intended that another individual would take possession of that firearm and without performing a background check on the intended recipient of the firearm. The petition made no mention of a statutory duty to perform a background check and made no mention of the doctrine of negligence per se. The claim was stated in the form of a negligent entrustment tort.

The tort of negligent entrustment is a creation of the common law. See *Upland Mutual Insurance, Inc. v. Noel*, 214 Kan. 145, 148, 149, 519 P.2d 737 (1974). The common law, as modified by constitutional and statutory law and caselaw, remains in force in this state. *Gaumer v. Rossville Truck & Tractor Co.*, 292 Kan. 749, 756, 257 P.3d 292 (2011); K.S.A. 77-109. No statutory authority is required to pursue common-law tort claims.

In Shirley's answers to interrogatories and in her response to the defendants' motion for summary judgment, she inserted a theory of negligence per se into her negligent entrustment claim. Shirley was inconsistent, however, in the way that she described such a theory. At times, she presented negligence per se as a statutorily created private cause of action, but at other times she argued that negligence per se statutorily defines the standard of care in a negligence action. Critical distinctions exist between these two approaches as they pertain to the present case.

Legislatures may create private causes of action that the common law did not recognize. See *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 275, 202 P.3d 7 (2009). For example, Congress enacted the Telephone Consumer Protection Act, which provides for a conditional private right of action, including damages, for plaintiffs who have received unsolicited advertising by telephone and facsimile transmissions. 47 U.S.C. § 227(b)(3)

(2006); *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 263 P.3d 767 (2011).

Most statutes do not, however, explicitly confer on potential plaintiffs a civil remedy. In particular, the firearms statutes at issue in the present appeal make no mention of civil remedies. See 18 U.S.C. § 922 (2000); 18 U.S.C. § 924 (2000); K.S.A. 2003 Supp. 21-4203.

Whether these statutes give rise to an independent private cause of action is irrelevant in the present case, however, because Shirley did not plead a statutory violation as the grounds for her suit. She instead presented a case based on simple negligence. In subsequent pleadings before the district court and in the parties' arguments on appeal, the parties have disagreed about the significance of statutory prohibitions on selling firearms to convicted felons.

The parties refer to an action that uses a statutory prohibition to establish a minimum standard of care as "negligence per se." At times the parties seem to regard negligence per se as a separate cause of action, and at times they seem to treat it as a subspecies of common-law negligence actions. In a similar vein, our courts have used the phrase inconsistently and with a variety of meanings. This confusion of meaning has led to a series of rules that are difficult to reconcile and equally difficult to apply. See *Shirley*, 44 Kan. App. 2d at 723-27 (Malone, J., concurring) (setting out a detailed history of negligence per se in Kansas and illustrating problems in applying the doctrine).

Because Shirley asserted only a claim of simple negligence and because she will be able to pursue that claim, we do not have to address at this time what a party must prove in order to state a claim that is created by statute. We instead are limited to considering what role the alleged statutory violations may play in a simple negligence action.

A plaintiff in a negligence action must prove four elements: a duty owed to the plaintiff, breach of that duty, causation between the breach of duty and the injury to the plaintiff, and damages suffered by the plaintiff. *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 831, 877 P.2d 430 (1994). A negligent entrustment claim, as a kind of negligence action, requires proof that the defendant en-

trusted a chattel to an incompetent entrustee with knowledge or reason to know of the entrustee's incompetence, and the entrustee's incompetence while using the chattel was the cause in fact of injury to the entrustee and/or another. *Martell v. Driscoll*, 297 Kan. 524, Syl. ¶ 5, 302 P.3d 375 (2013). The Restatement (Second) of Torts § 286 (1964) explains that a court may adopt as a standard of conduct of a reasonable person the requirements of a legislative enactment.

In the present case, Shirley seeks to include in her case certain statutory prohibitions on distributing firearms to felons and regulations designed in part to control systematically the manner in which firearms are distributed in order to reduce the likelihood that felons will acquire them. See K.S.A. 2003 Supp. 21-4203; 18 U.S.C. § 922; 18 U.S.C. § 924. These laws fill in some of the elements of a negligent entrustment claim. They may establish that certain convicted felons are incompetent to possess firearms, and the violation of controls on how sales are to be carried out may establish the defendant's constructive knowledge of the purchaser's incompetence.

In order to utilize a statute to establish a duty of care, a plaintiff must fully satisfy the duty requirements of a negligence action, including the requirement that the defendant owe the duty to the plaintiff. This basic premise of tort law has led to certain confusion in our caselaw relating to statutory violations.

In *Schlobohm v. United Parcel Service, Inc.*, 248 Kan. 122, 125, 804 P.2d 978 (1991), this court held: "Statutes or ordinances enacted to protect the public at large . . . do not create a duty to individuals injured as a result of the statutory violation and the doctrine of negligence per se is inapplicable." This sweeping statement undermines the very purpose of statutory enactments. In effect, it suggests that the more people that a statute was designed to protect, the less protection the statute affords to the public. As a consequence, if a statutory duty is intended to protect most people, then it may appear that a defendant has a diminished obligation to carry out that duty. This is not the correct way to analyze the duty requirement in a negligence action.

As Prosser and Keeton on Torts points out:

"The class of persons to be protected may of course be a very broad one, extending to all those likely to be injured by the violation [of a statute]. Thus a statute requiring druggists to label poisons, a pure food act, *a law prohibiting the sale of firearms to minors*, or an ordinance governing the servicing of gas lines, must clearly be intended for the benefit of any member of the public who may be injured by the act or thing prohibited." (Emphasis added.) Prosser and Keeton, The Law of Torts § 36, p. 224 (5th ed. 1984).

The proper inquiry is therefore not whether the class of persons to be protected by a statute is small or large, but whether the statute intends to protect the class, even if it includes all members of society, from a particular kind of harm. Prosser and Keeton on Torts states it this way: "The purpose of the legislation is of course a matter of interpretation of its terms, in the light of the evil to be remedied." Prosser and Keeton on Torts § 36, p. 225.

There are certainly some statutes that create no duty of conduct toward the plaintiff and afford no basis for the creation of such a duty by the courts. For example, statutes such as those restricting various activities on Sunday are obviously intended only to protect the community at large in terms of tranquility and morality rather than to protect the safety of any particular individuals. If a statute prohibits mowing lawns on a Sunday and an individual nevertheless mows his or her lawn on Sunday and injures a passerby, the statutory violation is unlikely to serve as evidence of a duty or its breach because the intent of the statute was not to protect public safety. See Prosser and Keeton on Torts § 36, pp. 222-23.

On the other hand, the fact that a statute is intended to protect the safety of a broad category of citizens, such as potential victims of violent felons, does not preclude application of the statute to establish a duty of care in a tort proceeding. The injury resulting from an action that violates a statute must only be of the character that the legislature intended to protect the public against. See, *e.g.*, *Shelden v. Wichita Railroad and Light Co.*, 125 Kan. 476, 481, 264 P. 732 (1928).

These principles—violation of a statutory duty, extension of that duty to the circumstances of the plaintiff, and causation—coalesce in the familiar circumstance of traffic-safety laws. For example, a plaintiff may use violation of traffic-control statutes to support a

claim of breach of a duty in negligence actions involving vehicles. This is true even when the laws do not explicitly create a private cause of action. See, *e.g.*, *Sterba v. Jay*, 249 Kan. 270, 276-77, 816 P.2d 379 (1991); *Williams v. Esaw*, 214 Kan. 658, 660, 522 P.2d 950 (1974). Violations of traffic-safety laws do not, however, impose strict liability on defendants. Plaintiffs must still establish actual and proximate causation between the statutory violation and the ensuing injury. See, *e.g.*, *Hammig v. Ford*, 246 Kan. 70, 75, 785 P.2d 977 (1990); *Esaw*, 214 Kan. at 660. A plaintiff may thus be able to introduce evidence that a defendant was driving faster than the statutory speed limit. This evidence tends to demonstrate breach of a duty, but the plaintiff will still have to prove causation between the excessive speed and the resulting injury.

It is sensible to conclude that the Kansas statute prohibiting the sale of firearms to certain convicted felons is intended to protect the citizens of this state from violent crimes committed by those felons. In *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 610 P.2d 1107 (1980), this court considered K.S.A. 21-4209 (Weeks 1974), which prohibited selling explosives to minors. The court examined the history of the statute and concluded that the primary purpose of the statute was "to protect the general public. An incidental consideration is the protection of those classes enumerated—minors, alcoholics, addicts, felons." 227 Kan. at 849. The court found it relevant that the statute fell under the general heading of "Crimes Against the Public Safety," which is the same heading under which K.S.A. 2003 Supp. 21-4203 (now K.S.A. 2012 Supp. 21-6303), prohibiting the sale of firearms to convicted felons, fell. See 227 Kan. at 847.

We conclude that violations of firearm-transfer statutes may be used by a plaintiff to establish a duty and a breach of a duty. Beyond establishing duty and breach, however, the plaintiffs will still have to prove the other elements of the tort they allege, including knowledge or constructive knowledge and causation.

*To What Level of Care Are Firearms Dealers in Kansas Held?*

The Court of Appeals held that Shirley had presented a case for negligent entrustment that withstood summary judgment. The

court rejected, however, Shirley's argument that the defendants be held to the "highest degree of care." This court granted review of that holding.

The nature of the duty of care in a negligence action is a question of law subject to de novo review. See *Sall v. T's, Inc.*, 281 Kan. 1355, 1360, 136 P.3d 471 (2006). Shirley contends that two Kansas cases support her theory that a firearms dealer must exercise the highest degree of care when selling firearms: *Wood v. Groh*, 269 Kan. 420, 7 P.3d 1163 (2000), and *Long v. Turk*, 265 Kan. 855, 962 P.2d 1093 (1998).

In *Wood*, a minor who had been accidentally shot and her parents brought a negligence action against the parents of the minor who shot the victim. The district court presented the jury with a simple reasonable care instruction. This court concluded that the instruction was prejudicially erroneous; instead, the jury should have received an instruction that "the highest standard of care is required when dealing with a dangerous instrumentality." 269 Kan. at 425-26. The court relied heavily on its opinion in *Long*.

In *Long*, the parent of a minor who had been shot and killed brought a negligence action against the father of the minor who shot the victim. The court noted that Kansas law requires heightened care in safekeeping inherently dangerous instrumentalities. 265 Kan. at 860. The court then held that a firearm is a dangerous instrumentality. 265 Kan. at 861-64.

Although *Long* involved the entrustment of a firearm by a fiduciary—a parent—the *Long* court specifically cited as support 21-4203, which prohibited the sale or transfer of handguns to minors. 265 Kan. at 864. The court relied not on the relationship between the provider of the firearm and the recipient of the firearm but on the duty to the public safety that the provider of a firearm assumes. 265 Kan. at 864.

The *Long* court cited to the Restatement (Second) of Torts § 298 (1964), which reads:

"When an act is negligent only if done without reasonable care, the care which the actor is required to exercise to avoid being negligent in the doing of the act is that which a reasonable man in his position, with his information and compe-

tence, would recognize as necessary to prevent the act from creating an unreasonable risk of harm to another."

The court quoted from Restatement (Second) of Torts § 298, Comment b, which reads in its entirety:

"*Care required.* The care required is always reasonable care. This standard never varies, but the care which it is reasonable to require of the actor varies with the danger involved in his act, and is proportionate to it. The greater the danger, the greater the care which must be exercised.

"As in all cases where the reasonable character of the actor's conduct is in question, its utility is to be weighed against the magnitude of the risk which it involves. (See § 291.) The amount of attention and caution required varies with the magnitude of the harm likely to be done if care is not exercised, and with the utility of the act. Therefore, if the act has little or no social value and is likely to cause any serious harm, it is reasonable to require close attention and caution. So too, if the act involves a risk of death or serious bodily harm, and particularly if it is capable of causing such results to a number of persons, the highest attention and caution are required even if the act has a very considerable utility. Thus those who deal with firearms, explosives, poisonous drugs, or high tension electricity are required to exercise the closest attention and the most careful precautions, not only in preparing for their use but in using them. Likewise, a driver approaching a railway crossing is required, for the protection of his passengers, to take precautions to ascertain whether a train is approaching, which would be unduly burdensome at any point where the only danger lay in the possibility of a trivial mishap."

Shirley urges this court to apply the principles set out in *Wood* and *Long*, which involved alleged negligence by parents in safeguarding firearms, to the present case, which involves the alleged negligent sale of firearms.

The Court of Appeals distinguished *Wood* and *Long* precisely along the lines of parental authority versus merchants' responsibilities. The court expressed concern that a heightened standard of care for merchants might preclude merchants from being able to sell firearms because of the threat of liability. 44 Kan. App. 2d at 718. The court opined that a heightened standard of care would impose liability in circumstances over which the merchant could not possibly avoid fault: "The 'highest degree of care' standard would establish negligence in situations where a reasonable firearms dealer would have no idea that the gun buyer is a straw-

person purchaser or has previously been institutionalized or adjudicated mentally incompetent." 44 Kan. App. 2d at 719.

In *Wood*, Justice Abbott expressed a similar concern, suggesting that the holding would create virtually unlimited liability for gun owners. 269 Kan. at 434-35 (Abbott, J., dissenting). But this fear has proven unfounded; Kansas courts have not been subject to a deluge of cases asserting negligent entrustment by gun owners as a result of the requirement that gun owners exercise great caution in allowing access to their weapons.

The Court of Appeals limited *Wood* and *Long* to situations involving gun owners who allowed unsupervised minors to gain access to guns, but the Restatement (Second) of Torts § 298, Comment b suggests that no such limitation is necessary. The Restatement states that the standard is always one of "reasonable care." This is the case whether the defendant is dealing with relatively innocuous items or with manifestly dangerous items, such as firearms. But what is reasonable depends in significant measure on the degree of harm that such an object likely poses.

The duty of care is intertwined with the foreseeability of harm. See *South v. McCarter*, 280 Kan. 85, 103-04, 119 P.3d 1 (2005) (injury is foreseeable so as to give rise to duty of care when defendant knows or reasonably should know that conduct will likely result in harm). This interconnection between foreseeability of harm and duty of care suggests that a seller of marbles may be subject to a relatively relaxed duty of care, even though it is possible to use marbles destructively, while a seller of firearms may be subject to a heightened duty of care, because it is more foreseeable that a firearm may cause serious injury. See *Jacoves v. United Merchandising Corp.*, 9 Cal. App. 4th 88, 116, 11 Cal. Rptr. 2d 468 (1992) ("Even though firearm use or possession has not been elevated to an ultra-hazardous activity resulting in the imposition of absolute liability, civil laws hold firearm use or possession to the highest standard of due care. Even a slight deviation from this standard in the use or possession of a firearm may constitute actionable negligence.").

As the Idaho Supreme Court has noted, the rules relating to negligent entrustment of firearms are nothing more than particu-

larized applications of general tort principles. *Ransom v. City of Garden City*, 113 Idaho 202, 207, 743 P.2d 70 (1987). When this court decided in *Wood* that a defendant is held to the highest standard of care "when dealing with a dangerous instrumentality," 269 Kan. at 426, it simply expressed the Restatement principle that the law requires one to be as cautious as reasonably possible when dealing with an object that has obviously lethal capabilities.

We see no need to back away from or limit our previous holdings that those in possession of firearms should exercise the highest standard of care in deterring the possession of those firearms by those who are at special risk to misuse the weapons. The legislature has determined that certain convicted felons fall within that special-risk group, and a firearms dealer must exercise the highest standard of care in order to avoid selling guns to such felons.

The portion of the Court of Appeals' decision allowing Shirley to proceed with a negligent entrustment action is affirmed, subject to our holding that she may invoke statutory obligations in order to advance her arguments that the defendants owed her a duty of care and breached that duty. The portion of the Court of Appeals' decision holding that the defendants are not held to the highest standard of reasonable care in exercising control over firearms is reversed. The case is remanded to the district court for further proceedings.

Judgment of the Court of Appeals affirming in part and reversing in part the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed in part, reversed in part, and remanded.