NOT DESIGNATED FOR PUBLICATION

No. 117,253

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MICHAEL MCEACHERN,
*Appellant*,

v.

JANA MORRIS and SAMER AL-HASHMI, M.D.,
*Appellees*.

MEMORANDUM OPINION

Appeal from Stevens District Court; BRADLEY E. AMBROSIER, judge. Opinion filed February 16, 2018. Affirmed.

*Michael McEachern*, of Hugoton, appellant pro se.

*Gregory S. Young* and *Brian L. White*, of Hinkle Law Firm LLC, of Wichita, and *Brian C. Wright*, of Wright Law Office, Chtd., of Great Bend, for appellees.

Before MCANANY, P.J., GARDNER, J., and TIMOTHY L. DUPREE, District Judge, assigned.

PER CURIAM: Michael McEachern appeals the district court's order granting summary judgment in favor of defendants Jana Morris, an advanced practice registered nurse, and Dr. Samer Al-Hashmi. In this appeal, we consider the summary judgment motions de novo. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013). Before addressing these motions, a brief review of the procedural history of the case is in order.

PROCEDURAL HISTORY

On April 14, 2015, McEachern commenced this action against Morris and Dr. Al-Hashmi for medical malpractice. He filed his amended petition on November 18, 2015. He generally alleged that Dr. Al-Hashmi committed medical malpractice by failing to diagnose his condition and by negligently supervising Morris. He alleged that Morris failed to provide him with the standard of care appropriate to her profession when she instructed him to stop taking prednisone.

On June 12, 2015, McEachern moved under K.S.A. 65-4901 et seq. for the appointment of a medical screening panel. On August 31, 2015, he withdrew his screening panel request, stating:

"Further investigation by Plaintiff into whether or not the abrupt cessation of a long regimen of oral steroids is in keeping with the standard of care expected has left no doubt that such a course of treatment is prima facie malpractice. To reach this conclusion we need no screening committee. Plaintiff will of course provide expert testimony confirming this, but the only real issues in this case will be, first, Did Defendants do what Plaintiff says they did, and, second, if they did, how much damage did they do him. Both these are questions for the jury."

On August 31, 2015, at the court's case management conference, McEachern was directed to designate his expert witnesses by March 4, 2016.

On March 4, 2016, McEachern filed a motion to forego expert testimony. The court denied this motion on June 10, 2016, and extended McEachern's expert disclosure deadline to June 15, 2016. McEachern failed to disclose an expert by this new deadline, and he failed to ask for a further extension. Instead, McEachern filed a motion asking the district court to appoint an expert. In his affidavit, filed July 18, 2016, McEachern stated he was proceeding pro se because he could not find a law firm willing to represent him

2

on a contingency fee basis, and that despite months of searching, he was unable to find a medical expert to testify on his behalf. The defendants opposed the motion. The district court denied the motion.

The court's pretrial conference was held on July 20, 2016. McEachern's contentions are outlined in five pages of single-spaced paragraphs in the court's pretrial order. His basic contention is that as a result of the abrupt cessation of prednisone, he went into adrenal crisis, nearly died, and suffers from life-long adrenal insufficiency. McEachern alleged medical negligence against Dr. Al-Hashmi for negligent supervision of Morris and failure to diagnose his condition. He alleged that Morris did not provide him with the standard of care appropriate to her profession when she instructed him to stop taking prednisone and to substitute an inhaled steroid.

As to causation, McEachern made the following statement in his contentions:

"The causal connection between the abrupt cessation long-term supraphysiologic doses of prednisone and the onset of adrenal crisis is known by virtually every competent medical doctor in the first world, and it was that cessation that caused plaintiff's dreadful illness, an illness that to a considerable extent lingers even more than three years after the malpractice. The deadly effects of abruptly stopping steroids after weeks of supraphysiologic doses is documented in thousands of medical writings, textbooks, learned treatises, most of which are written to address effective interventions, as the causal connection between steroid cessation and the onset of adrenal crisis has long been seen as a given, beyond dispute."

McEachern claimed damages due to the adrenal crisis and his ongoing need for steroid medication. He did not designate any expert witness to testify regarding the standard of care, negligence, causation, or damages.

3

On August 11, 2016, Dr. Al-Hashmi filed his motion for summary judgment. Morris filed her motion for summary judgment the following day. McEachern opposed these motions. On December 14, 2016, the court issued its order sustaining both motions and granting summary judgment to both defendants. McEachern's appeal brings the matter to us for our de novo review.

On appeal, McEachern asserts: (1) the district court erred in granting summary judgment to the defendants; (2) the requirement that plaintiffs produce expert testimony in a medical malpractice case is unconstitutional; and (3) the district court erred in rejecting McEachern's claim of negligence per se. All of these claims require our de novo review. We will address the negligence per se claim as part of our summary judgment analysis.

*Summary Judgment*

Here are the facts which form the basis for the defendants' motion for summary judgment. To the extent plaintiff did not fully agree with the defendants' proposed uncontroverted facts, we have identified the aspect that is controverted.

*Uncontroverted Facts*

In January 2012, McEachern saw his primary care physician, Dr. Kurt Gambla in South Carolina, for exacerbation of his asthma condition and his recent weight loss. Dr. Gambla noted that McEachern has type 2 diabetes and hypertension.

In February 2012, McEachern again saw Dr. Gambla for malaise, fatigue, and "possible secondary adrenal insufficiency."

Thereafter, McEachern moved from South Carolina to Kansas.

4

On March 13, 2013, McEachern went to the Stevens County Medical Clinic. His primary complaints were a productive cough, sore throat, wheezing, and chest tightness. He was examined and evaluated by Morris, an advanced practice registered nurse. At this appointment, McEachern reported a history of asthma. He told Morris that he was taking oral albuterol and theophylline tablets twice daily. McEachern also reported that he had been taking prednisone for many years as needed to address asthma flare-ups, usually not for more than a few days at a time. But McEachern had been taking 20 mg of prednisone daily for the past six to eight weeks, which was unusual.

Morris diagnosed McEachern with acute bronchitis and asthmatic bronchitis. McEachern claims that Morris instructed him to stop the three drugs he was taking and replace them with two puffs per day of fluticasone propionate.

McEachern received an antibiotic injection of ceftriaxone and a steroid injection of methylprednisolone. He was also prescribed azithromycin and albuterol aerosol treatments. McEachern requested his testosterone levels be checked due to decreased energy and erectile dysfunction. He also requested an estrogen level check. He was advised to return if his symptoms became worse or did not improve in two to three days.

On March 20, 2013, McEachern returned to see Morris, reporting that he did not feel better. His documented medications included prednisone 10 mg daily, but McEachern claims this was incorrectly reported in his medical records. His antibiotic was changed to cefdinir, and he was advised to increase his inhaler to two puffs twice a day. An overnight oxygen study was ordered and a rocephin injection was given. A chest x-ray was negative for pneumonia.

On April 8, 2013, McEachern returned to see Morris and indicated that he was not feeling better and was having trouble urinating. His medications list included 10 mg of prednisone daily. Multiple tests were ordered, including a urinalysis, CT angiogram,

5

EKG, and a venous Doppler study. McEachern was also advised to start atenolol for his tachycardia.

The next day, McEachern returned to see Morris. He was given IV fluids. CT scans of his abdomen and pelvis were ordered.

On April 10, 2013, McEachern reported that he was feeling better. The documented drug list indicated that McEachern was still taking prednisone.

The scans were completed on April 11, 2013, and showed gallstones and a small hiatal hernia. McEachern's documented drug list showed that he was still taking 10 mg of prednisone daily, but he claims this documentation was incorrectly noted. At this point, Morris discussed his condition with Dr. Al-Hashmi.

On April 15, 2013, McEachern returned to Morris, with primary complaints of nausea and a sore right foot. He had a rash on both sides of his chest and upper extremities that began three days earlier. He had tachycardia, with a pulse rate of 139. Morris ordered an EKG, which showed arrhythmias. McEachern was taken to the emergency room at Stevens County Hospital for further evaluation.

At the emergency room, Dr. Al-Hashmi examined and treated McEachern for the first time. It is unclear from the records whether McEachern disputes that this was the first time Dr. Al-Hashmi examined him, but he asserts that Dr. Al-Hashmi was involved in the treatment and supervision of his case no later than April 8, 2013.

During this visit to the emergency room, Dr. Al-Hashmi evaluated and treated McEachern for tachycardia. McEachern reported a history of asthma, hypertension, type 2 diabetes, osteoporosis, and hypothyroidism.

6

Dr. Al-Hashmi ordered a Thallium Stress Test for the following day and advised McEachern to stop taking theophylin and albuterol in preparation for the test. McEachern disputes the fact that Dr. Al-Hashmi ordered the cessation of the medication, and McEachern claims the medical records have been altered.

On April 16, 2013, prior to the start of the Thallium Stress Test, McEachern had a heart rate of 140 beats per minute. Dr. Farhoud, a Wichita cardiologist, was consulted. Initial efforts to control McEachern's tachycardia were unsuccessful. McEachern chose to leave the hospital against medical advice.

On April 24, 2013, McEachern went to the St. Catherine Hospital Emergency Room in Garden City. His chief complaint was weakness and weight loss. He was diagnosed with gallstones and alcohol abuse. Dr. Ajay Thakur was consulted. In his assessment and plan, he noted:

> "Generalized weakness secondary to adrenal vein insufficiency. Given the fact that the patient had been taking 20 mg of prednisone on and off for at least 15 years for asthma, I think this adrenal insufficiency is secondary to the steroid and his standard high-dose cosyntropin stimulation test is positive for adrenal insufficiency because it does not have a peak of more than 18 mcg/dL, because the cortisol level does not have a peak of more than 18-20 mcg/dL in 30 or 60 minutes. I discussed with the patent about the nature of his illness. Will start him on a stress dose of hydrocortisone 100 mg IV q 8 hours, first dose to be given now, and also discussed with the patient that in the future he will need a bracelet saying that he has adrenal insufficiency in case he is sick and unresponsive, he can be given a steroid urgently and there is also possibility that with the steroid he will have diabetes and his diabetes needs to be treated on the proper followup. Will also develop osteoporosis and will need to have a DEXA scan and probably bisphosphonate therapy for his osteoporosis secondary to this longstanding steroid."

McEachern was discharged the following day and instructed to follow up with his primary care physician in two weeks regarding his adrenal insufficiency.

7

On May 15, 2013, McEachern had his gallbladder removed at St. Catherine Hospital.

On July 2, 2013, McEachern saw his primary care physician in South Carolina. There was no documentation of adrenal insufficiency in his note. Dr. Gambla later testified that the most likely cause of McEachern's adrenal insufficiency was chronic steroid use.

McEachern's claims in this case are grounded in medical negligence. He has not designated a medical expert to testify on his behalf regarding any of his claims against the defendants.

*District Court's Ruling*

The district court held a hearing on the motions for summary judgment. At the conclusion of the hearing, the district court granted the defendants' motions based on McEachern's failure to designate an expert witness to support his claims.

In its journal entry of judgment, the district court noted that McEachern had attached an affidavit from a physician in Pakistan, but noted that the witness would not be available to testify at trial and the affidavit did not meet the standard of admissibility required to counter a motion for summary judgment. The district court concluded: "Thus, [McEachern] has no expert on standard of care, deviation from standard of care, or causal relationship between any such deviation and the damages claimed. Absent an expert, summary judgment is mandatory under the facts of this case." The court further ruled:

- The case did not fall under one of the narrow exceptions to the general rule that expert testimony is necessary in a medical malpractice action.

8

- The medical treatment at issue is not a subject of common knowledge and understanding.

- McEachern has not established negligence per se because the interpretation and application of protocols under the circumstances in this case require expert testimony.

- McEachern's arguments regarding the difficulty of finding an attorney and the difficulty of finding an expert witness have no bearing on the legal question at the heart of the motions.

REVIEW STANDARDS

The standard of review for summary judgment is as follows:

"""Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]""" *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 (2016).

Medical malpractice is negligence of a healthcare professional in the diagnosis, care, or treatment of a patient. See *Webb v. Lungstrom*, 223 Kan. 487, 490, 575 P.2d 22 (1978). In a medical malpractice action, the plaintiff bears the burden of proof to establish the elements of negligence. *Irvin v. Smith*, 272 Kan. 112, Syl. ¶ 2, 31 P.3d 934 (2001). In order to meet this burden, the plaintiff must establish that:  (1) defendants

9

owed a duty to the plaintiff and were required to meet an appropriate standard of care in the plaintiff's care and treatment; (2) defendants beached this duty or deviated from the standard of care; (3) injury; and (4) a causal connection between the duty breached and the injury suffered. *Watkins v. McAllister*, 30 Kan. App. 2d 1255, 1258, 59 P.3d 1021 (2002); see *Nold v. Binyon*, 272 Kan. 87, 103, 31 P.3d 274 (2001); *Delaney v. Cade*, 255 Kan. 199, 202-03, 873 P.2d 175 (1994).

Specific to Dr. Al-Hashmi, "[a] physician or surgeon is expected to have and to exercise that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices, or similar communities." *Chandler v. Neosho Memorial Hospital*, 223 Kan. 1, 3, 574 P.2d 136 (1977). The same standard of care is applicable to Morris, who is an advanced practice registered nurse. See PIK Civ. 4th 123.01.

Negligence is never presumed in a medical malpractice case, and no inference of negligence arises from an adverse result. *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988); *Tatro v. Lueken*, 212 Kan. 606, 611, 512 P.2d 529 (1973). There is a presumption that a health care provider has skillfully treated a patient in accordance with the standard of care. *Gust v. Jones*, 162 F.3d 587, 593 (10th Cir. 1998). As such, in response to the defendants' motions for summary judgment, McEachern was required to come forward with admissible evidence to create a genuine issue of material fact regarding his claims that the defendants deviated from their applicable standard of care in their treatment of him.

DISCUSSION

The role of the expert is to assist the fact-finder in understanding scientific or technical facts and principles whose applications and interaction lie beyond the capacity and understanding of laymen. See *Hare v. Wendler*, 263 Kan. 434, 440, 949 P.2d 1141

10

(1997). Due to the normative complexity of medical treatment issues, expert testimony is particularly necessary in medical malpractice actions:

> "In medical malpractice actions, strong reliance has to be placed on expert rather than lay testimony. The admission of expert testimony is based on necessity arising out of the particular facts of each case. Expert testimony is necessary where normal experience and qualifications of lay persons serving as jurors does not permit them to draw proper conclusions from the facts and circumstances of the case." *Pope v. Ransdell*, 251 Kan. 112, Syl. ¶ 3, 833 P.2d 965 (1992).

Thus, the standard for proper medical care must be established by the testimony of competent medical experts. See *Chandler*, 223 Kan. at 5.

McEachern claims that Morris advised him to stop taking prednisone during the initial March 13, 2013 office visit, and that, as a result, he suffered an adrenal crisis. He claims that the abrupt cessation of prednisone is medical malpractice and does not require an expert's opinion to establish negligence. In the pretrial order, McEachern contended:

> "The causal connection between the abrupt cessation long-term supraphysiologic doses of prednisone and the onset of adrenal crisis is known by virtually every competent medical doctor in the first world, and it was that cessation that caused plaintiff's dreadful illness, an illness that to a considerable extent lingers even more than three years after the malpractice. The deadly effects of abruptly stopping steroids after weeks of supraphysiologic doses is documented in thousands of medical writings, textbooks, learned treatises, most of which are written to address effective interventions, as the causal connection between steroid cessation and the onset of adrenal crisis has long been seen as a given, beyond dispute."

But McEachern oversimplifies the issue. McEachern had a complex history of comorbidities and complicating circumstances. Dr. Gambla noted the possibility of adrenal insufficiency after he examined McEachern on February 16, 2012. This was

about a month before McEachern's first visit with Morris. Dr. Gambla also testified that the most likely cause of McEachern's adrenal insufficiency was chronic steroid use, contrary to McEachern's claim that the adrenal insufficiency was caused by the abrupt cessation of the prednisone. The complexity of medical issues, medical treatment, and causation issues required McEachern to produce expert medical testimony to support his claims.

McEachern points to an affidavit that he provided as evidence that a medical expert is not required. In the affidavit, Dr. Muneeb Ali, a physician located in Pakistan, stated that directing a patient who had been taking 20 mg daily of prednisone for six weeks to abruptly stop taking the prednisone and substitute fluticasone propionate "would be exceedingly dangerous and would likely result in the patient suffering an adrenal crisis, a life-threatening condition." Dr. Ali noted that prednisone should be tapered off over a period of weeks to allow the body's natural hormone production to recover. Ali concluded:

> "That I can state with confidence that such a course of treatment would fall far short of any accepted standard of medical care, and that this is well known and documented in hundreds if not thousands of medical texts, Davidson's Textbook of Medicine, Kumar & Clark's Medicine, Oxford Handbook of Medicine, Cecil's Manual of Medicine and Harrison's Internal Medicine, to name but a few. They all warn that abruptly ending a weeks-long supraphysiological-dosage-regimen of steroids will bring on an iatrogenic adrenal crisis."

Dr. Ali's affidavit did not refer specifically to McEachern's case or indicate that he had reviewed McEachern's medical records. Instead, Dr. Ali indicated his opinions were based on his "general medical knowledge and authoritative medical information sources available to the public at large." He does not identify the applicable standards of care. His opinion on breach is generic. He does not address the issue of Dr. Al-Hashmi's supervision of Morris. He does not opine on the interplay of McEachern's various

12

preexisting medical conditions with respect to McEachern's current complaints. He gives no opinion as to causation or damages relating to McEachern's claims. Dr. Ali's assertions have not been subject to cross-examination, and McEachern has not expressed an intention to call Dr. Ali as a witness at trial or to attempt to introduce Dr. Ali's affidavit into evidence at trial.

McEachern claims that Dr. Al-Hashmi failed to properly supervise Morris and that Dr. Al-Hashmi failed to diagnose his condition. He claims that nurse Morris deviated from her standard of care in her treatment recommendations on March 13, 2013. The level and nature of supervision Dr. Ali-Hashmi should have exercised over Morris, an advanced practice registered nurse, is not within the common knowledge of a lay juror. An expert medical witness is necessary to properly educate the jury on these matters. As to the claim of failure to diagnose, Dr. Al-Hashmi examined McEachern on April 15 and April 16, 2016, and McEachern left the hospital against medical advice while Dr. Al-Hashmi was attempting to diagnose him. Lay jurors do not know the appropriate standard of care Dr. Al-Hashmi was required to meet under these circumstances, nor do they know the standard of care required of an advanced practice registered nurse in recommending treatment.

Once the applicable standards are established, expert medical testimony is necessary to show that Dr. Al-Hashmi and nurse Morris deviated from their applicable standard of care. Jurors are not permitted to speculate as to the adequacy of a medical provider's care based on their common knowledge and experience without specific evidence of the applicable standard of care and the conduct which constitutes a breach of that standard. See *Collins v. Meeker*, 198 Kan. 390, 399, 424 P.2d 488 (1967).

Further, the causal connection between the acts of the defendants and McEachern's claimed injuries and damages require expert medical testimony. See *Nold*, 272 Kan. at 103. The existence of a causal connection between the breached duty and the injuries

13

sustained is a question of fact that ultimately must be resolved by the jury. *Wicina v. Strecker*, 242 Kan. 278, 280-81, 747 P.2d 167 (1987). The element of proximate cause is defined as "the cause that in a natural and continuous sequence, unbroken by any [superseding] cause, both produced the injury and was necessary for the injury. The injury must be the natural and probable consequence of the wrongful act. [Citation omitted.]" *Hale v. Brown*, 287 Kan. 320, 322, 197 P.3d 438 (2008).

Expert testimony is unnecessary if the normal experience and qualifications of jurors allows them to draw proper conclusions from the provided facts and circumstances. *Schlaikjer v. Kaplan*, 296 Kan. 456, 464, 293 P.3d 155 (2013). "[T]he well-established test for determining whether expert testimony is required is whether the subject matter is too complex to fall within the common knowledge of the jury and is 'beyond the capability of a lay person to decide.' [Citations omitted.]" *Williamson v. Amrani*, 283 Kan. 227, 245, 152 P.3d 60 (2007). But as stated in *Hare*, 263 Kan. at 441, "[e]ven when there is no factual dispute about what the treating physician did or failed to do, questions of causation in medical malpractice cases are often complex." Thus, Kansas law generally requires an expert in medical malpractice cases to opine on the issue of the cause of the plaintiff's injury. *Sharples v. Roberts*, 249 Kan. 286, 296, 816 P.2d 390 (1991) (expert medical testimony is ordinarily required in medical malpractice cases to establish causal connection between plaintiff's injuries and defendant's negligence); *Mellies v. National Heritage, Inc.*, 6 Kan. App. 2d 910, Syl. ¶ 4, 636 P.2d 215 (1981). Only where causation is obvious—meeting the test of the common-knowledge exception—is expert testimony not required. 6 Kan. App. 2d at 917.

The common-knowledge exception relieves the plaintiff of the burden to provide expert testimony because the standard of care and causation are within the common knowledge of a layperson.

14

"This common knowledge exception applies if what is alleged to have occurred in the diagnosis, treatment, and care of a patient is so obviously lacking in reasonable care and the results are so bad that the lack of reasonable care would be apparent to and within the common knowledge and experience of mankind generally. [Citation omitted.]" *Webb*, 223 Kan. at 490.

The common-knowledge exception is used very sparingly. See *Munoz v. Clark*, 41 Kan. App. 2d 56, Syl. ¶ 7, 199 P.3d 1283 (2009). In order for the common-knowledge exception to apply, the plaintiff must assert a claim of medical malpractice regarding medical care that was so patently bad that a person without medical knowledge could assess the wrongfulness of the care without expert testimony. *Hare*, 263 Kan. at 442. The sparse application of the common-knowledge exception is exemplified by the following cases.

In *Cunningham v. Riverside Health System, Inc.*, 33 Kan. App. 2d 1, 99 P.3d 133 (2004), the plaintiff alleged that in trying to help her into bed, a nursing assistant negligently twisted the plaintiff's leg and broke her femur. Cunningham was recovering from knee replacement surgery and suffered from a preexisting condition of osteoporosis. The nursing assistant positioned Cunningham's immobilized leg in accordance with her doctor's recommendations for healing. Plaintiff sought to rely on the common-knowledge exception to support the claim, but the district court granted summary judgment against her, ruling that expert testimony was needed to support a claim for negligence. This court agreed. Expert testimony was required for both causation and the standard of care. 33 Kan. App. 2d at 7-8.

In *Webb*, the defendant performed surgery on plaintiff's forearm tendon following an accident in which the plaintiff was using a ramset gun. The surgical repair was successful, but the surgeon failed to notice and remove a metal fragment during the surgery. Plaintiff contended that no medical expert testimony was needed because the

surgeon clearly violated the standard of care by failing to take x-rays during surgery. But our Supreme Court held that the need to take x-rays during surgery was not a matter of common knowledge that obviated the need for medical expert testimony. *Webb*, 223 Kan. at 490-91.

In *St. Francis Regional Med. Center, Inc. v. Hale*, 12 Kan. App. 2d 614, 752 P.2d 129 (1988), the district court granted summary judgment to the defendants based on the plaintiff's reliance on the common-knowledge exception in lieu of medical testimony. This medical malpractice case centered on several metal hemoclips that were left inside the plaintiff's body following coronary bypass surgery, resulting in a staph infection. The plaintiff attempted to rely on the common-knowledge exception to establish negligence based on: (1) the failure to provide safe and sanitary operating facilities; (2) the failure of nurses to notify physicians of the swelling and infection; (3) the failure of hospital records to show that hemoclips had been used; (4) the failure to culture, x-ray, and diagnose the infection at an earlier date; and (5) the failure to properly treat the infection after it was discovered. There was not expert medical testimony to establish the hospital's standard of care. The court found the hospital's duty was "not so obvious as to fall within the common knowledge exception," and whether the hospital breached the standard of care regarding the occurrence of the staph infection was not "so obvious that a lack of reasonable care by the hospital would be apparent to a lay person." 12 Kan. App. 2d at 620.

Similarly, expert testimony was necessary to establish the standard of care for assisting a nursing home resident with daily activities in *Tudor v. Wheatland Nursing, L.L.C.*, 42 Kan. App. 2d 624, Syl. ¶ 4, 214 P.2d 1217 (2009). Also, in *Crowly v. O'Neil*, 4 Kan. App. 2d 491, Syl. ¶ 6, 609 P.2d 198 (1980), the physician admitted severing the patient's common bile duct during gallbladder surgery, but expert testimony was still required to establish the applicable standard of care.

When our courts have permitted the use of the common-knowledge exception, the deviation from an obvious standard of care was not within the realm of fair debate. Most of these cases arise from the failure of attending physicians to remove foreign objects from the body following treatment, such as surgical sponges, gauze, or instruments. See *Voss v. Bridwell*, 188 Kan. 643, 660-62, 364 P.2d 955 (1961) (to apply common-knowledge exception, injury must be of the type that ordinarily would not occur absent medical negligence); *Rule v. Cheeseman, Executrix*, 181 Kan. 957, 962-63, 317 P.2d 472 (1957) (inference of negligence when physician failed to remove gauze from the patient's abdomen after gallstone surgery); *Bernsden v. Johnson*, 174 Kan. 230, 238, 255 P.2d 1033 (1953) (no need for expert medical testimony when the physician left a metal tongue suppressor in plaintiff's throat for 36 hours); *Schwartz v. Abay*, 26 Kan. App. 2d 707, 712, 995 P.2d 878 (1999) (applying the common-knowledge exception when the surgeon removed 60% of the wrong vertebral disc); see also *McKnight v. St. Francis Hosp. & School of Nursing*, 224 Kan. 632, 634-35, 585 P.2d 984 (1978) (applying common-knowledge exception when patient fell onto the floor during an x-ray when the table was tilted vertically).

McEachern has not cited any medication management cases which apply the common-knowledge exception. The decision to stop the prednisone and the potential effects on the patient are not matters within the average layperson's common knowledge. Here, expert medical testimony is required to explain complex medical issues to the fact-finders. The common-knowledge exception does not apply.

McEachern's offer to use medical treatises as proof that the defendants deviated from the standard of care does not suffice. The treatises do not relate to the unique circumstances of McEachern's conditions and treatments. They cannot provide the requisite causal link between these defendants' actions and McEachern's claimed injuries and damages. McEachern alleges that abruptly stopping the prednisone caused an adrenal crisis, but no medical expert testified that he suffered an adrenal crisis in the spring of

17

2013. In fact, he may have been suffering from adrenal insufficiency before he came under Morris' care. McEachern has a complex medical history and suffers from various preexisting medical conditions which may have caused or exacerbated his injury. Under these circumstances, expert testimony is required to sort all this out and establish causation.

McEachern asks us to take judicial notice of the causal connection between the abrupt cessation of prednisone and the onset of adrenal crisis. See K.S.A. 60-412(c). But the judicial notice statute is not intended to establish a key element in a negligence claim, and McEachern does not cite any authority supporting its use in this way. K.S.A. 60-409(b) allows the court to take judicial notice of "facts as are so generally known or of such common notoriety within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute." Here, the causation between the abrupt cessation of prednisone and the adrenal insufficiency does not fall under this type of common knowledge because it is not widely known by a layperson within the territorial jurisdiction of the court.

Finally, McEachern argues that he should be allowed to pursue a claim of negligence per se based on alleged violations of K.S.A. 2016 Supp. 65-1130(d), which relates to the protocol for an advance practice registered nurse prescribing drugs. A claim of negligence per se is generally a claim which uses a violation of a statute which sets a minimum standard of care to prove negligence. See *Shirley v. Glass*, 297 Kan. 888, 893-97, 308 P.3d 1 (2013).

McEachern did not prosecute this action as a case of negligence per se. It was not pled in his petition or amended petition. He first raised the theory in his response to these summary judgment motions. This theory is not properly before us for consideration. See *Shirley*, 297 Kan. at 894; *Blackwell v. Gorrell*, No. 114,374, 2016 WL 5012446, at *4 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. 1316 (2017) (court does

18

not need to address question of whether violation of statute constitutes negligence per se because the theory was not pled).

Besides, there is no indication that the Legislature intended K.S.A. 2016 Supp. 65-1130(d) to provide for an individual right of action for an injury arising out of a violation of the statute. See *Pullen v. West*, 278 Kan. 183, 194, 92 P.3d 584 (2004); *Tudor*, 42 Kan. App. 2d at 632-33; *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 370-71, 819 P.2d 587 (1991); *Nichols v. Kansas Political Action Committee*, 270 Kan. 37, 51-52, 11 P.3d 1134 (2000); *Greenlee v. Board of Clay County Comm'rs*, 241 Kan. 802, 804, 740 P.2d 606 (1987). Instead, K.S.A. 2016 Supp. 65-1130(d) provides for detailed regulatory and enforcement procedures administered by the Kansas State Board of Nursing rather than a private right of action. And finally, relying on the statute does not obviate the need to provide expert medical testimony on the issue of causation.

McEachern fails to provide necessary expert medical testimony to support essential elements of his medical malpractice claims: (1) the applicable standard of care for each of the defendants, (2) breach of the applicable standards of care, and (3) causation linking any such breach with the injuries he claims. As a matter of law, without that essential testimony McEachern cannot prevail on his claims. The defendants are entitled to judgment as a matter of law on McEachern's claims. The district court did not err in so ordering.

## CONSTITUTIONAL CLAIM

McEachern argues that requiring a plaintiff to present expert medical testimony in a medical malpractice action is unconstitutional because it results in the exclusion of many lawsuits by plaintiffs with bona fide complaints and actual damages.

In his motion to forego expert testimony and in his motion to call a malpractice screening panel, McEachern asserted that the cost of expert testimony and reports are a barrier to court access, and in turn, violate "the Kansas Constitution's Bill of Rights, § 1 (equal rights), § 5 (the right of trial by jury), and § 18 (justice without delay), as well as the due process and equal protections guaranteed by the Fourteenth Amendment to the U.S. Constitution." McEachern objected to the defendants' initial draft of the journal entry granting summary judgment, asserting that the requirement of expert testimony violates both the Kansas Constitution and the United States Constitution unless an expert is provided to plaintiffs at no cost or with the cost deferred until after the conclusion of the trial.

A point incidentally raised in a brief and not argued therein is deemed abandoned. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013). Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d 602 (2015).

To support this constitutional claim McEachern recounts his struggles in attempting to retain counsel and a medical expert, but he provides little to no substantive argument or legal authority in support of his constitutional challenge. He argues:

> "The Kansas Constitutional provisions implicated in this obstructive rule are three from the Bill of Rights, § 1. Equal rights, § 5, Trial by jury, and § 18, Justice without delay. § 1 tells us that '[a]ll men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness.' It's 'life' that is threatened here; these medical tortfeasors can and do kill people. The pursuit of happiness comes into it, too, as there is very little happiness without justice, and the rule requiring experts, as it's presently handled, militates directly against justice. § 5, Trial by jury, needs no explanation, nor does § 18, Justice without delay."

20

McEachern directs us to Rule 706 of the Federal Rules of Evidence, which allows but does not require federal courts to appoint experts for parties in certain circumstances. This rule has rarely been applied or allowed within the civil setting. See *Rachel v. Troutt*, 820 F.3d 390, 397-98 (10th Cir. 2016); *Cox v. Ann*, Case No. 12-2678-KHV-GLR, 2014 WL 1011679, at *3 (D. Kan. 2014) (unpublished opinion). But Kansas does not have a statute similar to Rule 706. Instead, K.S.A. 2016 Supp. 60-226 clearly recognizes the retention and disclosure of experts by each party rather than by the court.

McEachern argues that obtaining an expert is expensive. So are many other aspects of litigation. But this in and of itself does not render the requirement unconstitutional. He appears to argue that in order for proceedings on a professional negligence claim to be constitutional, the court or the Legislature must appoint an independent expert. We find no support for this notion in our state or federal Constitutions. McEachern has failed to provide any supporting authority or persuasive argument to support his constitutional claim.

Affirmed.