No. 117,705

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

POWER CONTROL DEVICES, INC., and PERSONAL BEST, INV.,
*Appellants*,

v.

MICHAEL "MICK" W. LERNER and LERNER LAW FIRM, P.A.,
*Appellees*.

SYLLABUS BY THE COURT

1.

To make a prima facie case for legal malpractice, the plaintiff must establish (1) the duty of the attorney to exercise ordinary skill and knowledge, (2) a breach of that duty, (3) a causal connection between the breach of duty and the resulting injury, and (4) actual loss or damage.

2.

In a legal malpractice claim, a plaintiff must establish the validity of the underlying claim by showing that it would have obtained a favorable judgment in the underlying lawsuit had it not been for the attorney's error. This is commonly referred to as proving the "case within a case."

3.

An attorney is an advocate for his or her client and is always trying to put the best case forward. But in a legal malpractice claim, an attorney's opinion of the case, the attorney's pleadings or filings in the case, or even the attorney's puffing about his or her abilities to prevail, is not evidence of any of the claims made in the underlying lawsuit.

**4.**

In a legal malpractice action, to prove what is commonly referred to as a "case within a case," the plaintiff must present the case as it would have been presented to a judge or jury and the fact-finder must make a determination solely on the evidence presented regarding that underlying case. This can be done by bifurcating the two parts of the legal malpractice case. If not bifurcated, there must be a clean demarcation between the two during the trial with, if a jury trial, appropriate jury instructions as to each.

**5.**

Nonexperts cannot give opinions or inferences during trial that are based on scientific, technical, or other specialized knowledge. K.S.A. 2017 Supp. 60-456(a).

**6.**

Where the essential claim of an action against an attorney is a breach of a duty imposed by law upon the relationship of attorney/client and not of the contract itself, the action is in tort.

Appeal from Johnson District Court; DAVID W. HAUBER, judge. Opinion filed January 25, 2019. Affirmed.

*Patrick A. Hamilton*, of Hamilton Law Firm LLC, of Lenexa, for appellants.

*James C. Morrow*, *Marshall W. Woody*, and *Hillary Hyde*, of Morrow Willnauer Church, LLC, of Kansas City, Missouri, for appellees.

Before ARNOLD-BURGER, C.J., GREEN, J., and ROBERT J. FREDERICK, District Judge, assigned.

ARNOLD-BURGER, J.:  In order to prevail in a claim of legal malpractice, "a plaintiff must establish the validity of the underlying claim by showing that it would have

2

resulted in a favorable judgment in the underlying lawsuit had it not been for the attorney's error." *Canaan v. Bartee*, 276 Kan. 116, 120, 72 P.3d 911 (2003). This is commonly referred to as proving the "case within a case." Here Power Control Devices (PCD) hired Michael "Mick" W. Lerner to represent it in a federal court breach of contract lawsuit against Orchid Technologies Engineering and Consulting (Orchid). The federal district court overseeing the case dismissed it, holding that PCD failed to bring the claim within the statute of limitations. PCD then sued Lerner for legal malpractice, alleging that he was negligent by filing the suit after the statute of limitations had passed. A jury agreed and awarded damages to PCD.

But following the verdict, the district court granted Lerner's motion for judgment as a matter of law, overturning the jury verdict in favor of PCD, on the basis that PCD failed to prove that it would have succeeded against Orchid at trial. In the alternative, the district court judge conditionally granted Lerner a new trial based on a separate instructional error—in case his judgment of no liability was overturned on appeal. However, the judge did not err when he ruled in favor of Lerner. The case between PCD and Orchid was highly technical, yet PCD failed to present any expert testimony to establish that it would have been successful against Orchid if its lawsuit against Orchid had been timely. Accordingly, we affirm the district court's decision granting judgment as a matter of law to Lerner.

FACTUAL AND PROCEDURAL HISTORY

Lerner is an attorney licensed to practice law in Kansas. PCD hired Lerner to represent it in a lawsuit against Orchid. Now, PCD is suing Lerner and The Lerner Law Firm for malpractice. In order to understand the malpractice suit, we begin by examining the underlying litigation.

*PCD's case against Orchid is examined.*

PCD manufactures electronic devices. Its primary product is servo amplifiers, which are used to drive motors in products such as radar systems, cameras, surveillance systems, and weapons control systems.

In the early 2000s, PCD's Israeli representative informed PCD of an advanced technology that presented a potential business opportunity worth millions of dollars to PCD if PCD could design and sell it. The product was a brushless direct current motor controller used in a missile navigation system. Another company, ELMO, was already making the controller. ELMO supplied the controller to Rafael Aerospace, the largest aerospace company in Israel. Rafael Aerospace provided the specifications of the controller to PCD. It also provided the ELMO controller to PCD. PCD attempted to create the controller on its own but was unsuccessful due to its lack of technical expertise. As a result, PCD reached out to Orchid, an engineering firm, to see if Orchid could design the controller.

Michael Allmayer, PCD's vice president of marketing, emailed Orchid's president Paul Nickelsberg in January 2004 to begin discussing the project. Eventually, the parties entered into a contract. The contract provided that Orchid would design and create a prototype of a brushless DC motor controller (BLDC1). PCD did not provide the ELMO controller to Orchid or even show it to Orchid as part of the negotiations with Orchid. It did not want Orchid to reverse engineer the ELMO controller, it wanted one made from scratch based solely from the ELMO specifications.

While the contract mentioned three different phases of project development, it only contained the Phase 1 development plan. In Phase 1, Orchid was required to provide four BLDC1 prototype circuit boards to PCD. The boards had to be "assembled, debugged and delivered to [PCD]" pursuant to a schedule in the contract. There were

4

numerous specifications in the contract. However, at the time the contract was written the specifications were still being developed so the contract specifications were expressly defined as merely "guidelines." The contract required PCD to "supply all prototype testing." The contract did not specify how the prototypes should be tested. The contract simply stated that Phase 1 would be completed when Orchid delivered the prototype boards to PCD.

Over the course of the next few months, Orchid worked on designing and programming the prototype. At the end of 2004, Orchid began sending prototypes to PCD. PCD would test them and give feedback to Orchid about what needed to be adjusted to comply with the specifications. Orchid ultimately sent four sets of prototypes.

Orchid sent its final prototypes to PCD on March 16, 2005. Orchid notified PCD that the prototypes were within specification and that it was ready to move on to the next phase of development. PCD tested the prototypes on April 4, 2005. PCD's tests showed that the prototypes were not within the specifications. Allmayer emailed Nickelsberg that day to inform Orchid of its test results.

> "We took measurements on the BLDC output current, which I've attached. So far, we haven't been able to verify the correct gain structure for the BLDC. At the 1 Volt command, the output shows a gain of approximately 9. Have you been able to externally verify that the unit is producing a current gain of 3 for every volt input command?
>
> "I'm interested in hearing your ideas on this."

After discussing the discrepancies in testing results, it was discovered that Orchid had been testing the total output current of the prototype current at the servo current node of the BLDC1 prototype while PCD measured the phase current of the prototype at the shunt current node. Orchid conducted more tests, including testing in the manner that it discovered PCD had been using. On April 29, 2005, Nickelsberg emailed Allmayer a

5

report—the BLDC1 Control Discussion and Review (Report). In the Report, Nickelsberg again asserted that Orchid's BLDC1 was performing correctly when tested "using industry-standard constant current monitoring techniques." The Report went on:

> "The current measured at the BLDC SERVO CURRENT node and the current measured at the SHUNT CURRENT nodes are not equivalent. The BLDC SERVO CURRENT node measures the actual amplifier output current. The SHUNT CURRENT nodes measure both forward and free-wheeling currents within the load. Once again, the measurements are not equivalent. The freewheeling currents in the load, measured at the shunt point present a false indication of the actual real current within the system."

Finally, the report stated that "very significant changes to the BLDC1 design will be required" if PCD wished to use the alternate phase current testing method. Allmayer explained that this Report was the first time he believed that Orchid would be unable to fulfill the contract.

When Orchid told PCD that PCD was measuring the prototypes incorrectly, PCD believed that Orchid was acting in good faith. PCD was relying on Orchid's expertise in design. It continued to work with Orchid even after the Report to remedy the issues.

As evidence of their continued discussion and cooperative working arrangement, PCD invited Nickelsberg to its plant to see, for the first time, a demonstration of the ELMO controller prototype provided by Rafael Aerospace. Nickelsberg visited the plant in August 2005. After witnessing the ELMO controller testing, according to Allmayer, Nickelsberg said, "'Now I get it. I get what I missed. This is—this is a really special piece of product.'" Nickelsberg continued by stating, "'Okay. I get it all now. Let me start probing experimental units and see what I can do to get you one that works.'"

Moreover, at the August demonstration, Nickelsberg indicated that even though the BLDC1 did not perform like the ELMO controller prototype, he believed the BLDC1

6

had value and was marketable. PCD personnel asked Nickelsberg if he would help PCD market the BLDC1 so PCD could make some money. Nickelsberg agreed and PCD suggested that the money made could be reinvested into the costs of building a new one from scratch. The parties agreed that would be a good idea. Orchid eventually sent PCD a new development plan. The new development plan would start the project over anew and would not use the technology that Orchid used in the original prototype designs—at additional cost to PCD. The parties continued to try to devise a way for the BLDC1 to work as hoped but they all finally determined it wasn't possible with the BLDC1 model.

Orchid did not follow through on its agreement to help PCD market the BLDC1. Everything was placed on hold. But, about a year later, PCD noticed that a picture and description of the BLDC1 was on the Orchid website—advertised as something Orchid designed and could manufacture for a customer. PCD believed this to be in violation of its confidentiality agreement with Orchid. PCD became concerned that Orchid was stealing its design. After several years, PCD decided to look for an attorney to bring a case against Orchid. On November 12, 2010, over five years after Orchid visited the PCD facility and discovered the need for a new development plan, PCD contacted Lerner. PCD and Lerner entered into a contract for Lerner to represent PCD. The contract was never reduced to writing. However, Lerner agreed at his malpractice trial that he had an obligation to PCD to file its lawsuit before the statute of limitations expired.

Lerner knew at the time he was hired that the statute of limitations would be a pressing issue in the case. Kansas' five-year statute of limitations for breach of contract claims had already expired. But, Orchid is a Massachusetts corporation and Massachusetts has a six-year statute of limitations.

Lerner believed that the statute of limitations would run on PCD's claims against Orchid on April 29, 2011—six years after the date Orchid sent the Report to PCD. He filed suit in the United States District Court for the District of Massachusetts on April 25,

7

2011. PCD contended that the contract required its method of testing. Orchid took the position that the prototypes worked and that it fulfilled its obligation under the contract when it delivered the prototypes. Orchid argued that once PCD accepted delivery of the prototypes, it then asked Orchid for something different.

The parties attempted mediation in May 2012, but it was not successful. The parties then began discovery. The case proceeded to a pretrial conference in March 2013, with the trial scheduled to occur the following month. At the pretrial conference, Orchid announced its intention to file for summary judgment based on the statute of limitations issue. The court postponed the trial and allowed the parties to file motions regarding summary judgment.

Orchid argued that PCD admitted in the joint pretrial memorandum that the alleged breach occurred on March 16, 2005. Orchid cited statements by PCD that it received Orchid's final design on March 16, 2005, and that it was aware that the design did not meet its specifications shortly thereafter. Orchid cited the parties' contract, which stated that the contract was finished with the delivery of the final prototypes. Orchid also argued that PCD made its final payment under the contract on April 4, 2005, which was outside of the statute of limitations period.

The federal district court granted Orchid's motion for summary judgment. It held that PCD discovered the breach of contract on April 4, 2005, when it tested the prototypes and found that they did not meet the contractual specifications. The court disregarded the Report because the parties' contract did not state that contract completion was contingent upon the receipt of such a report. Rather, the Report "simply confirmed what Power Control already suspected, i.e., that the prototypes did not meet plaintiff's standards." The court further stated that "[g]iven that the plaintiff only needed notice of its potential cause of action and not confirmation of breach from the defendant, it certainly had such notice prior to receiving the April 29th report."

8

PCD appealed to the First Circuit Court of Appeals. However, it decided not to pursue the appeal because the cost of appeal would exceed the damages it sought from Orchid. PCD and Orchid settled the case. The settlement included assurances regarding the protection of PCD's design and source code.

*The current malpractice case is examined.*

PCD filed suit against Lerner and The Lerner Law Firm in September 2015. The petition stated five causes of action: legal malpractice, breach of contract, breach of fiduciary duty, fraud, and negligent misrepresentation. The district court scheduled the case for a jury trial. The case proceeded to jury trial on the legal malpractice claim.

After evidence was presented, Lerner filed a motion for judgment as a matter of law. Lerner noted that PCD was not planning to present any expert testimony at trial. Without expert testimony, Lerner argued, PCD would be unable to prove that Orchid breached the contract in the underlying case. The district court took the motion under advisement and allowed the case to proceed to the jury.

Throughout the trial, there was a lot of conflicting testimony concerning whether Lerner was negligent in not filing the case before April 4, 2005, and whether the federal judge was correct in dismissing the case on that basis. Suffice it to say that reasonable minds could differ as to when the statute of limitations began to run in the underlying case. But following trial, the jury found that Lerner was negligent in providing legal services to PCD, and Lerner does not challenge that factual finding in this appeal.

The jury further found that Orchid breached its contract with PCD, and that PCD's lawsuit against Orchid would have been successful but for Lerner's negligence. It awarded PCD $279,067.35. The jury found that the value of the underlying breach of

9

contract claim against Orchid was $58,977.50. The rest of the damages award was costs and expenses PCD incurred in bringing the underlying case against Orchid.

Lerner filed a renewed motion for judgment as a matter of law after the trial. The district court granted Lerner's motion and set aside the jury verdict. The court held that PCD failed to demonstrate that Orchid breached the underlying contract. The court stated that PCD failed to provide evidence regarding a contractual requirement for testing protocols. The court noted that PCD did not present expert testimony to prove its claim that Orchid breached the contract. The court rejected PCD's argument that Lerner's own testimony through the pleadings he filed and the discussions he had with PCD executives and lawyers could be used to prove that Orchid breached the contract.

In addition to granting Lerner's motion for judgment as a matter of law, the district court conditionally granted him a new trial based on invalid jury instructions. The court held that the jury instructions were insufficient insofar as they failed to instruct the jury on the proof necessary to establish the breach of contract claim between Orchid and PCD. The court also noted that a majority of the damages award, $220,089.85, was the amount that PCD spent on attorney fees and expenses in the underlying case against Orchid. The court held that attorney fees from an underlying case in a malpractice action are not recoverable. The court's reasoning was that such a recovery would amount to a double recovery for the plaintiff—the value of the underlying breach of contract claim plus the underlying attorney fees. Although, the court noted, the plaintiff would be entitled to recover attorney fees incurred in prosecuting the legal malpractice claim. Therefore, the court set aside that portion of the verdict. The court added that, should a new trial occur, any damages awarded at the new trial could not include the attorney fees and expenses incurred in the underlying case.

PCD appealed.

ANALYSIS

*The district court did not err by granting Lerner's motion for judgement as a matter of law.*

PCD's first argument on appeal is that the district court erred in granting Lerner's motion for judgment as a matter of law. The district court's primary basis for granting Lerner's motion was that PCD failed to prove that it would have prevailed against Orchid in the underlying case. Lerner asserts that this was the correct conclusion, and that PCD did not provide any evidence at trial that it would have prevailed against Orchid. Lerner argues that PCD failed on this point because it did not identify a material term in the contract that Orchid breached, and it did not have an expert witness who could testify as to how Orchid's prototypes failed to satisfy the contract. On the other hand, PCD argues that the district court did not consider all the evidence, and that it improperly weighed evidence in granting the motion. Specifically, PCD argues that Lerner's testimony provided "substantive evidence upon which the jury could determine if Orchid breached the Contract." PCD also cites Nickelsberg's statements as an "admission to PCD's principals that the prototypes did not meet the contractual specifications."

In reviewing the district court's decision, we apply the same standard as did the district court and review the motion de novo.

> "A district court must deny a 60-260(a) motion if evidence exists upon which a jury could properly find a verdict for the nonmoving party. In evaluating the motion, a district court must resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied." *Russell v. May*, 306 Kan. 1058, Syl. ¶ 2, 400 P.3d 647 (2017).

To make a prima facie case for legal malpractice, PCD had to show: "'(1) the duty of the attorney to exercise ordinary skill and knowledge, (2) a breach of that duty, (3) a causal connection between the breach of duty and the resulting injury, and (4) actual loss or damage.'" *Canaan*, 276 Kan. at 120. Additionally, "a plaintiff must establish the validity of the underlying claim by showing that it would have resulted in a favorable judgment in the underlying lawsuit had it not been for the attorney's error." 276 Kan. at 120. The only element of legal malpractice at issue in this appeal is whether PCD would have prevailed against Orchid in the underlying claim.

The parties' primary dispute was whether the prototypes met the contractual specifications. Orchid tested the prototypes and believed that they met the specifications. PCD tested the prototypes and believed that they did not meet the specifications. In the underlying litigation, each side had experts prepared to testify. Orchid hired David Saar and PCD hired Michael Sidman. Saar testified in a deposition that Orchid tested the total output current of the prototype. This is different than measuring phase current. PCD believed that this testimony was key to its case because it asserted that the specifications in the contract related to phase current. PCD also planned to call Sidman in the underlying case. Sidman would testify that PCD used the proper testing method. Sidman personally tested the prototypes at PCD's plant.

The contract between Orchid and PCD did not specify how the prototypes were to be tested. Determining which party was correct, and thus who should have prevailed in the underlying litigation, required PCD to provide evidence that it was testing the prototypes correctly and in accordance with any industry standards that existed. However, its expert Sidman did not testify in the malpractice case. Furthermore, the district court judge held that Sidman's opinions were not allowed into evidence other than through his direct testimony because they were hearsay. PCD was attempting to prove its case through Lerner's hiring of Sidman as an expert in the case and Lerner's trust in Sidman's opinions, without actually calling Sidman to the stand to testify. PCD also

failed to provide any evidence that its use of the phase current testing it conducted was performed correctly or even required by the contract.

We pause to note PCD's trial strategy throughout the case was to prove its underlying case against Orchid through Lerner. Because Lerner, as PCD's counsel, argued strenuously in pleadings and in meetings with Allmayer and others that he could prove Orchid violated the terms of the contract, then all of Lerner's pleadings and statements were evidence that Orchid breached the contract. This is a dangerous path and one that the district judge repeatedly and properly criticized. An attorney is an advocate for his or her client and is always trying to put the best case forward. But in a legal malpractice action, an attorney's opinion of the case, the attorney's pleadings or filings in the case, or even the attorney's puffing about his or her abilities to prevail, is not evidence of any of the claims made in the underlying lawsuit. As Judge Hauber so aptly put in his ruling granting judgment for Lerner as a matter of law:

> "During oral argument, when asked to identify the witnesses or evidence that indicated PCD had shown a breach of contract, plaintiffs' counsel asserted that they had proved their case through Mr. Lerner's testimony, which he characterized as 'admissions.' The Court rejects this proposition. Lawyers must zealously represent their clients in all cases, but, as the standard instruction indicates, statements of counsel are not evidence. [PIK Civ. 4th 102.04.] Their statements may be useful to guide a jury on the issues, but their written submissions, arguments and briefs are not evidence, only advocacy. None are admissible evidence in the underlying case."

See *Heinze v. Bauer*, 145 Idaho 232, 238, 178 P.3d 597 (2008) ("statements made on behalf of a client in the course of representation are not personal admissions that may be used against the attorney in subsequent litigation"); *Barcola v. Hourigan, Kluger & Quinn P.C.*, 82 Pa. D. & C.4th 394, 411 (2006) ("If statements and arguments made by counsel in furtherance of a client's claim were routinely deemed to constitute binding admissions against a lawyer in a subsequent legal malpractice action, it could

13

conceivably have a chilling impact upon the vigor and resulting effectiveness of counsel's advocacy.").

The only other evidence that PCD contends supports the jury verdict regarding breach of the PCD-Orchid contract is the Report itself, indicating that the two entities are using different testing methods and the statement made by Nickelsberg several months after the alleged breach, as relayed by Allmayer, "'Now I get it. I get what I missed. This is—this is a really special piece of product. . . . Okay. I get it all now. Let me start probing experimental units and see what I can do to get you one that works.'" But again, as Judge Hauber points out in his order:

"No explanation was provided as to what 'he got' or what he 'missed' or even whether it related to any contractual requirement or testing protocol. Mr. [Allmayer] could not provide foundation for an admission without describing, competently, and with foundation, what aspect of the device's performance somehow related to the ELMO or why it mattered. Following that trip, Mr. [Allmayer] testified that Mr. Nickelsberg sent a new proposal to create a BLDC2. The testimony read to the jury from his deposition established that he was an engineer. He testified that design is a 'process' and a prototype is a step along that process.

"When handed the [Report], Mr. Nickelsberg testified that he was involved in the testing and 'may have done them.' He was shown the graph of results of measurements of current from the prototype. He recounted his trip to PCD. When asked about the readings from the device, he said PCD 'indicated that there were readings that it seemed like they didn't understand or that weren't in accord with what they expected.' The testimony does not pinpoint any specific aspect of the 'readings.' He was asked about 'revisiting' the development plan after the August trip and he said he did not recall entirely why they were doing so other than the parties were 'trying to look for ways all through these few months to make something [for] PCD that was affordable and feasible.' When challenged as to whether Orchid was 'trying to meet the written specifications of the [original] development plan,' he responded:  'We had already met the written specifications of the development plan.' He then agreed that they were trying to do something '*beyond* meeting

14

those written specifications' with the new development plan. Finally, when Mr. Lerner kept challenging him about when Orchid was trying to meet the original specifications after [proposing] a revised development plan, he reiterated that they *had met them* and that PCD apparently 'wanted something different' to meet the same specifications.

"The foregoing fails to demonstrate a breach of contract in a case that required expert testimony to establish what was made, tested and how it mattered under the contract specifications. A party cannot unilaterally impose a requirement for testing in a certain manner [without] conveying the same by contract. There is no evidence of any contract provision, specifications or otherwise that was breached. Certainly, there is no evidence of damages as it relates to what was received versus what was expended.

"Plaintiffs never sought this Court's interpretation of any of the terms of the contract which can be interpreted as a matter of law. *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011). Even the Pretrial Order fails to specify what aspect of the contract was breached. If the Court cannot interpret the contract to determine what precise issues should be submitted to the jury, then submitting any associated breach of contract claim would invite speculation."

To prove what is commonly referred to as "a case within a case," the plaintiff must present the case as it would have been presented separately to a judge or jury and the fact-finder must make a determination solely on the evidence presented regarding that underlying case. This can be done by bifurcating the two parts of the legal malpractice case. If not, there must be a clean demarcation between the two during the trial. In this case, the two issues were hopelessly combined and confused with little guidance to the jury regarding how to sort it out.

In sum, PCD did not present expert testimony in its malpractice case against Lerner. Under Kansas' rules of evidence, nonexperts cannot give opinions or inferences that are "based on scientific, technical or other specialized knowledge." K.S.A. 2017 Supp. 60-456(a). The engineering concepts in this case certainly qualify as scientific, technical, or other specialized knowledge. Thus, to prove the "case within a case," PCD

needed to have an expert testify that Orchid failed to meet the contract specifications. See *City of Arkansas City v. Bruton*, 284 Kan. 815, 842-43, 166 P.3d 992 (2007) ("Interpretation of the engineering plans and specifications is not something that is within the common knowledge of the public; it is a matter that requires the technical explanation of an expert in the field."). The district court correctly found that expert testimony was necessary to prove the underlying case, and because it was not provided, we affirm the district court's entry of judgment for Lerner as a matter of law.

*The district court did not err by refusing to instruct the jury on PCD's breach of contract claim against Lerner.*

PCD also contends on appeal that the district court erred in not allowing its separate breach of contract claim to go forward. During the jury instructions conference, PCD asked the court to instruct the jury on its breach of contract claim. PCD cited Lerner's testimony, in which he testified that he had a contractual duty to file the case against Orchid within the statute of limitations, as a basis for the instruction. PCD argued that it should be able to recover the fees and expenses paid to Lerner under the contract. In other words, Lerner contracted to timely file a case, he breached the contract; therefore, PCD is entitled to a return of its attorney fees, unrelated to whether it would have prevailed in the underlying case. Accordingly, PCD argued that it would not have to prove that the underlying litigation with Orchid would have been successful to prevail on its breach of contract claim against Lerner. The district court held that the breach of contract theory was the same as the malpractice claim—failure to timely file the lawsuit against Orchid. The district court refused to instruct the jury on PCD's separate breach of contract claim, holding that PCD's claims against Lerner sounded in tort. PCD appealed the district court's ruling and makes the same arguments here as it did to the district court.

The standard of review for jury instruction issues has several parts. First, this court exercises unlimited review to determine whether the issue was preserved for appeal.

16

Second, the court employs unlimited review of the record to determine if the requested instruction was legally and factually appropriate. Third, if the district court erred, this court must determine whether the error was harmless. *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018). The "first and third step are interrelated in that whether a party has preserved a jury instruction issue will affect our reversibility inquiry at the third step." *State v. Bolze-Sann*, 302 Kan. 198, 209, 352 P.3d 511 (2015). If a party preserves the issue, as PCD did here, then the district court's error is reversible if this court determines there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016).

Having determined that PCD preserved this issue for appeal, the next step is determining whether a breach of contract instruction was legally and factually appropriate. The issue presents a question of law, and this court's review is unlimited. *Hunt v. KMG Main Hurdman*, 17 Kan. App. 2d 418, 419, 839 P.2d 45 (1992). There are a number of Kansas cases which discuss the issue. The Kansas Supreme Court has explained:

> "Legal and medical malpractice generally constitute both a tort and a breach of contract. An action for liability of an attorney on the grounds of negligence for failure to discharge his professional duty to a client rests on the employment contract and therefore is contractual in nature. Where the act complained of is a breach of specific terms of the contract without any reference to the legal duties imposed by law upon the relationship created thereby, the action is contractual. Where the essential claim of the action is a breach of a duty imposed by law upon the relationship of attorney/client and not of the contract itself, the action is in tort." *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 85-86, 716 P.2d 575 (1986).

The Kansas Supreme Court examined this distinction in *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 552 P.2d 885 (1976). There, Rose Malone went to the University of Kansas Medical Center (KUMC) for treatment. After being examined, a

17

physician gave her a prescription for an alleged infection and told her to return home. The next day, Malone became ill and suffered immense pain. An ambulance took her back to KUMC. Her uterus had ruptured and it caused a fetus she was carrying to die. Without her consent, doctors performed a total abdominal hysterectomy. Malone sued KUMC for breach of contract. One count of her petition alleged that when she first went to KUMC for treatment the parties entered into an express contract under which KUMC "agreed to provide 'complete, competent, and necessary medical treatment' for her." 220 Kan. at 372. Another count of her petition alleged that when she returned to the hospital the following day the parties entered into an express contract under which KUMC "agreed to provide 'only necessary, competent and authorized medical treatment' for [her]." 220 Kan. at 372. The district court dismissed Malone's petition, holding that her action was one in tort and not in contract. Malone appealed.

The Kansas Supreme Court explained the distinction between contract and tort actions, stating: "A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement. A tort, on the other hand, is a violation of a duty imposed by law, a wrong independent of contract." 220 Kan. at 374. The court identified the primary issue as "whether the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising by virtue of the alleged express agreement between the parties." 220 Kan. at 374. The court noted that physicians could "enter into express contracts by which they bind themselves to warrant the success of treatment, or to otherwise obligate themselves above and beyond their ordinary duties." 220 Kan. at 374. Those contracts, the court noted, "may form the basis for breach of contract actions." 220 Kan. at 374. However, that was not the case with Malone's allegations. Malone's allegations were that KUMC failed to exercise the "reasonable care, skill, and diligence which the law requires of hospitals and physicians—regardless of any express contract therefor between the parties." 220 Kan. at 376. The court concluded that Malone's action clearly sounded in tort, and thus KUMC was immune from liability. 220 Kan. at 376; see also *KPERS v. Reimer & Koger Assocs.,*

18

*Inc.*, 262 Kan. 110, 114-15, 936 P.2d 714 (1997) (holding that a breach of contract claim against a law firm was properly characterized as a tort action because it alleged that the firm failed to properly advise the plaintiff).

*Malone* can be contrasted with *Juhnke v. Hess*, 211 Kan. 438, 506 P.2d 1142 (1973). In that case Carl Juhnke sued attorney Herbert Hess for failure to timely file an appeal on Juhnke's behalf. Juhnke owned land which the City of Hutchinson condemned. A court-appointed appraiser awarded Juhnke $1,250. Juhnke hired Hess to file an appeal of the appraiser's award. But, Hess failed to file a timely appeal. Juhnke alleged that, had his appeal been timely filed, he would have received an award exceeding $50,000. Hess filed a motion to dismiss arguing that Juhnke's action sounded in tort, and that the two-year statute of limitations for tort actions had run. The district court agreed and granted Hess' motion to dismiss. Juhnke appealed, arguing that his claim was based on breach of contract and that the three-year statute of limitations for such causes of actions had not yet run. The Kansas Supreme Court agreed with Juhnke. It held that Hess' agreement to timely file the appeal, and Juhnke's agreement to pay him, was the consideration for the lawsuit. 221 Kan. at 441. The "real basis of [Juhnke's] claim for relief [was] financial loss resulting from failure to discharge a contractual obligation (proof of which contract, breach and loss is another matter)." 221 Kan. at 441. The court reversed and remanded the case. 221 Kan. at 442.

Before analyzing the issue, it is worth noting that PCD did not present evidence of an express contractual promise by Lerner to file the case within the statute of limitations. The only evidence PCD presented was the following question and answer:

"Q:  All right. And you had a legal and contractual obligation to Power Control Devices under the contract to file its lawsuit in a timely fashion, meaning before the statute of limitations expired.

"A:  I've said so and I'll say it again, yes, absolutely."

19

As the Kansas Supreme Court has explained, an attorney's obligation to perform a legal duty is contractual in nature because the duty exists by virtue of the employment contract. *Pancake House*, 239 Kan. at 85-86. In that sense, Lerner had a contractual obligation to timely file PCD's lawsuit. But PCD did not provide evidence, as in *Juhnke*, that Lerner's promise to file suit was an express promise and part of the bargained-for consideration that formed the basis of PCD's contract with him.

This case is more akin to *Malone* than *Juhnke*. Lerner's duty to determine when the statute of limitations ran and timely file suit required him to exercise skill and judgment. PCD is alleging that Lerner failed to exercise the "degree of learning, skill, and care that a reasonably competent lawyer would use in similar circumstances." *Canaan*, 276 Kan. at 129. This is not a case where Lerner promised something above and beyond his ordinary duty. Such a promise may have formed the basis for a breach of contract action. See *Malone*, 220 Kan. at 374. PCD's claim in this case is that Lerner breached a duty imposed by law—the claim cannot be made "without any reference to the legal duties imposed by law upon the relationship created" by the employment contract between PCD and Lerner. *Pancake House*, 239 Kan. at 86. Therefore, the district court did not err in failing to give a breach of contract instruction.

But even if the district court erred, the error was harmless. An error is harmless if this court determines that there is a reasonable probability that the error did not affect the outcome of the trial in light of the entire record. *Louis*, 305 Kan. at 457-58. The reason why any instruction error here would be harmless is because PCD failed to prove that the alleged breach of contract resulted in damages.

In order to prevail on a breach of contract claim, a plaintiff must prove:

"(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with

20

the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d 1083 (2013).

PCD argues that it is entitled to be reimbursed for the attorney fees it paid to Lerner, as well as the costs and expenses it incurred in bringing the suit. It asserts that it is not required to prove that it would have succeeded in the underlying litigation against Orchid in order to recover these damages. However, PCD does not provide support for its position. PCD does note that there are no cases which require plaintiffs in breach of contract cases against lawyers to prove that they would have prevailed in the underlying litigation. While this appears to be true, it is likely because such claims are properly characterized as tort claims (which do require such proof) and not as breach of contract claims.

"Generally speaking, when awarding contract damages, the goal is to put the nonbreaching party in the position he or she would have been in had the breach never occurred." *Peterson v. Ferrell*, 302 Kan. 99, 106, 349 P.3d 1269 (2015). Here, if the alleged breach had never occurred PCD still would have paid Lerner the attorney fees that PCD now requests as damages. Allowing PCD to seek those attorney fees would not put it in the same position it would have held had the suit against Orchid been timely filed. If the alleged breach had not occurred, PCD would have been able to proceed to trial against Orchid. PCD may have prevailed at trial. If that were the case, then the damages for Lerner's alleged breach of contract would have been the value of any judgment PCD would have obtained against Orchid. However, as discussed above PCD failed to prove that it would have prevailed in the underlying litigation. This means that any failure of the district court to instruct the jury on PCD's breach of contract claim was harmless error.

Based on our holding affirming the granting of judgment as a matter of law to Lerner, we need not address the district court's alternative findings related to a possible retrial.

Affirmed.