No. 128,132

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MARK LETOURNEAU and DEBORAH LETOURNEAU,
*Appellees*,

v.

LAW OFFICES OF RICHARD M. LESTER, RICHARD M. LESTER, and MICHAEL K. DEKRUIF,
*Appellants*.

SYLLABUS BY THE COURT

1.

In a legal malpractice action, to prove what is commonly referred to as a "case within a case," the plaintiff must present the underlying case as it would have been presented to a judge or jury and the fact-finder must make a determination solely on the evidence presented regarding that underlying case. This can be done by bifurcating the two parts of the legal malpractice case.

2.

In a legal malpractice case, the standard of proof in the underlying case within a case is not diminished nor is its presentation subject to relaxed evidentiary standards.

3.

Because a legal malpractice claim requires the proponent to present the case as it would have been presented separately to a judge or jury, replacing expert witnesses with testimony from an attorney who is simply reviewing and introducing expert witness reports is not sufficient to establish the elements of the underlying case.

1

Appeal from Wyandotte District Court; CONSTANCE M. ALVEY, judge. Oral argument held September 16, 2025. Opinion filed January 2, 2026. Reversed and remanded with directions.

*Michelle R. Stewart* and *Ashley N. Jarmer*, of Hinkle Law Firm LLC, of Lenexa, for appellants.

*Christina J. Nielsen*, pro hac vice, of Nielsen Law Firm, LLC, of Talladega, Alabama, *Eric S. Playter*, of Playter & Playter, LLC, of Kansas City, Missouri, and *A. Scott Waddell*, of Waddell Law Firm, LLC, of Overland Park, for appellees.

Before ARNOLD-BURGER, P.J., HURST, J., and JACOB PETERSON, District Judge, assigned.

ARNOLD-BURGER, J.:  In a legal malpractice action, to prove what is commonly referred to as a "case within a case," the plaintiff must present the underlying case as it would have been presented to a judge or jury and the fact-finder must make a determination solely on the evidence presented regarding that underlying case. This can be done by bifurcating the two parts of the legal malpractice case.

This legal malpractice case involves whether an attorney can offer the sole expert testimony in the underlying personal injury lawsuit by simply referencing and introducing engineering studies, medical reports, lifecare planning analysis, and economic damage calculations.

To allow the underlying personal injury case to proceed with no subject matter expert witnesses regarding engineering studies, medical damages, and future loss of earnings was error. And because proof of the personal injury negligence action was a prerequisite to the legal malpractice action, the decision of the district court is reversed and the case remanded directing the district court to enter judgment for the Law Offices of Richard M. Lester, Richard M. Lester, and Michael K. DeKruif (Defendants).

FACTUAL AND PROCEDURAL HISTORY

Only the facts necessary to explain the crux of the case are set out here. More facts will be provided as they are related to each issue raised.

On an evening in October 2012, Mark LeTourneau lost control of his motorcycle as he was on Highway 281 near Great Bend. At the time, the highway was under construction as part of a contract between Venture Corporation (Venture) and the Kansas Department of Transportation (KDOT). Venture overlayed the roadway with asphalt. Because it was not completed yet, there was an inch or two drop off between the old asphalt and the new overlay making the pavement uneven. Although his friend and road partner, Francisco Mendoza, was able to negotiate the roadway without incident, LeTourneau drove off the pavement and was thrown from his motorcycle. He suffered significant injuries which required multiple surgeries.

The LeTourneaus (Mark and his wife, who had a loss of consortium claim) asserted that the condition created by Venture was dangerous and had resulted in several injuries preceding his, including one fatality. Venture responded that the construction and warning signs were all compliant with applicable state and federal regulations, and it had completed all tasks KDOT had required of it.

Based on the foregoing, the Law Offices of Richard M. Lester (Lester Firm), represented by Michael DeKruif, filed a personal injury lawsuit against Venture Corporation and KDOT in California federal court—the LeTourneaus lived in California. But in February 2015, a federal judge dismissed the case for lack of jurisdiction, transferring the case to a federal district court in Kansas. The federal court also dismissed KDOT from the case without prejudice "on the basis of Eleventh Amendment immunity," and that was never challenged. So the case arrived in Kansas with Venture as the only

defendant, although as a comparative fault state its fault could be compared against KDOT and the LeTourneaus.

Consistent with Kansas District Court Local Rules, Lester engaged the services of Thomas J. Dickerson and his law firm, Dickerson Oxton, LLC, as local counsel. Dickerson's role as local counsel was to review documents prepared by the attorneys at the Lester Firm for compliance with Kansas law and to file documents. Dickerson agreed to be the "supervising attorney" for the LeTourneaus' personal injury lawsuit in exchange for a 25% share of the contingency attorney fee. The Lester Firm was responsible for pleadings, depositions, expert witness retention, and trial preparation.

On September 9, 2015, Dickerson entered his appearance in the United States Federal District Court for the District of Kansas as attorney of record for the LeTourneaus. At some point, it was agreed that DeKruif would be lead counsel on behalf of the Lester Firm and would be the primary attorney handling the trial, although DeKruif never entered an appearance in the case.

Several things happened prior to trial that Dickerson viewed detrimental to the case. First, they were only able to introduce evidence of one prior accident involving a motorcycle at that location, when there were several—one of the excluded cases involving a fatality. Second, the case was transferred to Wichita, a venue Dickerson viewed as much less favorable than Kansas City, Kansas.

In addition, in his communications with Lester as late as April 2018 (three months prior to trial) Dickerson appeared to value the case between $700,000-$800,000 and indicated that "[i]f [$]700 plus is on the table, I think that would warrant serious consideration from the clients." He indicated he thought he would "take one last stab here before we start seriously preparing [for trial]." According to Dickerson's trial testimony,

4

the LeTourneaus had offered to settle for $800,000 but he considered that $700,000 may have been more appropriate after they found out the case would be transferred to Wichita.

Otherwise, the case proceeded as planned. Jury instructions were essentially approved, an agreement was reached on exhibits, experts designated, depositions completed, and a pretrial order in place. Everyone seemed to be ready to try the case the first part of August 2018.

DeKruif was expected to attend a pretrial motion in limine hearing in July 2018 but was not present because of an unexplained medical emergency. Once he was notified of DeKruif's unexplained nonappearance, and a lack of information regarding whether he would be available at all, Dickerson believed he would need to step in as trial counsel. But Dickerson was already scheduled to be at another trial on the same day and needed more time to prepare. He filed an emergency motion for continuance of trial. The judge denied the motion the next day, explaining that DeKruif had never entered his appearance and that Dickerson was the attorney of record, so by local rule he was required to meaningfully participate in the trial.

Dickerson found himself 10 days from trial. As he began trial preparations, he quickly learned, through his staff, that only one of the expert witnesses hired by DeKruif, a traffic engineer, would be available to testify in person. The medical doctor and economist were available by video, but Dickerson believed the judge might strike them as witnesses since they had been designated as live witnesses on the court's scheduling order. However, he did not ask the court to allow remote testimony under the circumstances or explain the sudden and unexpected medical emergency of DeKruif. The life care planner the LeTourneaus planned to use indicated he too was completely unavailable. After contacting the LeTourneaus, Dickerson negotiated a $495,000 settlement, rather than go to trial with what he deemed to be insufficient expert testimony, which the LeTourneaus accepted. The LeTourneaus acknowledged in the

5

agreement that they were not entering into the agreement "under any form of force, duress, or coercion."

In July 2019, the LeTourneaus filed a lawsuit in state court raising claims of legal malpractice, breach of fiduciary duty, and violations of the Kansas Consumer Protection Act against the Lester Firm, as well as Richard Lester and DeKruif in their individual capacities. By the time the case was submitted to the jury, the LeTourneaus had dismissed all but the legal malpractice claim.

Before trial, the LeTourneaus designated Dickerson as their sole expert witness to provide both factual testimony on his experience with the Defendants in the underlying case, as well as

> "expert testimony and opinions on the operative standard of care of personal injury lawyers in the State of Kansas, Defendants' failure to adhere and/or meet the same, the damages sustained by Plaintiffs as a proximate result of Defendants' breach of the standard of care, and the causal connection between Defendants' acts and omissions and Plaintiffs' damages."

Defendants filed a pretrial motion in limine, based primarily on this court's decision in *Power Control Devices, Inc. v. Lerner*, 56 Kan. App. 2d 690, 437 P.3d 66 (2019), arguing that Dickerson was not competent to offer opinions about engineering, medical care, life-care planning, and economic loss to prove the elements of the underlying "'case within a case'" to support the LeTourneaus' legal malpractice claim. Defendants also argued Dickerson's expert testimony would be unduly prejudicial due to his personal involvement in the underlying case. Defendants further challenged the admission of any opinion evidence or reports from the four experts retained by the Lester Firm on the underlying personal injury, noting that the LeTourneaus had not designated them as expert witnesses in the legal malpractice action.

6

The district court denied Defendants' motion in limine with respect to Dickerson's expert testimony, ruling that he could testify as to his opinion on the elements that needed to be proven in the underlying case. As to the underlying experts' opinions and reports, the court said that Dickerson could rely on those opinions to form his own but that the admissibility of the reports or testimony would be considered on a question-by-question basis.

The case proceeded to a jury trial in August 2023, at which the LeTourneaus' sole expert witness was Dickerson. At the conclusion of the LeTourneaus' presentation of evidence, the Defendants moved for judgment as a matter of law on the legal malpractice claim, arguing the evidence failed to prove the underlying negligence claim. The district court denied the motion. Before submitting the case to the jury, the LeTourneaus withdrew most of their claims and proceeded only on the legal malpractice claim. The jury found for the LeTourneaus on their legal malpractice claim, awarding them $3,563.832.88 in damages.

After trial, Defendants renewed their motion for judgment as a matter of law. The district court also denied this motion, explaining that it was not necessary to prove the underlying case because it had already been decided through the settlement agreement. It is important to note that the settlement agreement contained a clause that denied any wrongdoing by any party to the agreement.

Defendants timely appealed.

7

*We first discuss the necessity of proving a case within the case in a legal malpractice claim such as this one.*

The LeTourneaus are suing their attorneys for legal malpractice. They claimed that because their retained counsel, the Lester Firm, and its employees failed to appear or adequately prepare to prosecute their personal injury claim, they were forced to enter a settlement agreement on the eve of trial that was less than they would have recovered had their primary retained attorney, Richard Lester, adequately prepared the case, appeared to represent them, and taken the case to trial.

To establish their claim they must prove to a jury that they would have obtained a more favorable judgment in the underlying lawsuit had it not been for the attorney's error and attendant forced settlement. *Canaan v. Bartee*, 276 Kan. 116, 120, 72 P.3d 911 (2003). So by necessity they must first establish the strength of their personal injury case. This is commonly referred to as proving the "case within a case." *Power Control Devices*, 56 Kan. App. 2d at 702.

To do this, the LeTourneaus "must present the case as it would have been presented separately to a judge or jury and the fact-finder must make a determination solely on the evidence presented regarding that underlying case." 56 Kan. App. 2d at 702. This is often done by bifurcating the two parts of the legal malpractice case—one trial for the personal injury claim, one trial for the legal malpractice claim. If not bifurcated, there must be a clean demarcation between the two during the trial with appropriate jury instructions as to each. 56 Kan. App. 2d at 702.

Here we are confronted with whether the case within a case can be established without subject matter expert witnesses concerning the negligence and damages that

8

resulted in the personal injury action. Over the objection of Defendants, the LeTourneaus were allowed to establish their personal injury claim solely through the testimony of their settlement lawyer, Dickerson—the same one who had filed a document in federal court identifying himself as the lead lawyer in the case. Dickerson was allowed to testify to what he believed the LeTourneaus' expert witnesses *would have testified to* based on their reports. Those witnesses were not required to be brought in for the case within a case so that they could be subjected to cross-examination and challenged as they would have been in the underlying trial. Dickerson's nonexpert hearsay testimony was deemed sufficient. Because Defendants did not present any experts that supported Venture's position, the jury was left with a one-sided view of the case. While Dickerson was not required to discuss or distinguish Venture's experts, the LeTourneaus did bear the burden to prove that they would have prevailed in the case had they not been forced, given the circumstances, to settle.

With that background we turn to the first issue raised by Defendants on appeal.

*The district court erred by allowing Dickerson to offer expert testimony regarding the findings of experts in the underlying personal injury action.*

Defendants first challenge the district court's ruling on their motion in limine, which allowed Dickerson to testify as an expert regarding the likelihood of prevailing on the merits of the underlying case based on the written opinions of the experts who had been hired to support the personal injury claims. Our analysis ultimately turns on determining the admissibility of the challenged evidence.

The Kansas Rules of Evidence, specifically K.S.A. 2024 Supp. 60-456, govern the admissibility of expert testimony. Under subsection (b), a witness qualified as an expert by knowledge, skill, experience, training, or education may testify if their testimony is based on sufficient facts or data, is the product of reliable principles and methods, and the

9

principles and methods have been reliably applied to the facts of the case. The admission of expert testimony is reviewed under an abuse of discretion standard. *Castleberry v. DeBrot*, 308 Kan. 791, 812, 424 P.3d 495 (2018). However, to the extent our review involves interpreting what is permitted under the expert witness statute, our review is de novo. See *Dawson v. Prager*, 276 Kan. 373, 376, 76 P.3d 1036 (2003).

Since the jury first had to examine whether there was sufficient evidence to show that the LeTourneaus' personal injury was the result of negligence and that the Defendants' negligence was the cause of their damages, we look to whether Dickerson would have been allowed to testify as an expert on these topics in the underlying case. Remember, *Canaan* and *Power Control Devices* both inform us that the proponent must present the case *as it would have been presented* separately to a judge or jury. *Canaan*, 276 Kan. at 120; *Power Control Devices*, 56 Kan. App. 2d at 702.

We pause to note that whether an expert is required at all in any particular case, including a negligence case, is very case specific. And as Judge McAnany so eloquently wrote in *State v. Henderson*, 32 Kan. App. 2d 1202, 1211, 96 P.3d 680 (2004), lawyers can certainly "*refer to the blueness of the sky or the breadth of the firmament without first calling a meteorologist or a cosmologist as an expert witness*." (Emphasis added.) But our caselaw also informs us that expert witnesses are necessary when the subject matter is beyond the common knowledge and experience of lay jurors. *Corbet v. City of Kensington*, 63 Kan. App. 2d 466, 483, 530 P.3d 750 (2023).

In a negligence action, the plaintiff carries the burden of proving the following four elements: (1) a duty owed to the plaintiff by the defendant, (2) a breach of that duty, (3) causation between the breach of the duty and injury to the plaintiff, and (4) damages suffered by the plaintiff. *Shirley v. Glass*, 297 Kan. 888, Syl. ¶ 4, 308 P.3d 1 (2013). "Kansas law does not presume negligence, nor does it allow negligence to be established

10

by conjecture, surmise, or speculation. Negligence must be proved by substantial competent evidence." *Yount v. Deibert*, 282 Kan. 619, 624, 147 P.3d 1065 (2006).

As we have previously noted, an expert witness is required to offer opinion testimony that is "based on scientific, technical or other specialized knowledge within the scope of subsection (b)." K.S.A. 2024 Supp. 60-456(a). The parties agreed that expert testimony was necessary to establish negligence, causation, and damages in their underlying case because they appropriately designated the experts and attendant documents in each of these areas that they were to use at trial. They retained the experts to provide reports that would ultimately support their theory of the case. The LeTourneaus do not argue that a lay witness could have testified at trial to topics they assigned to their experts: a traffic engineer, a medical doctor, a life planner, and an economist. They have never disputed that these were claims that required an expert at trial to explain based on their specialized knowledge, skill, experience, training, or education. Yet, nothing in the record shows that Dickerson had the requisite knowledge, skill, experience, training, or education to testify as anything other than a legal expert. And we know of no caselaw that would support a holding that the standard of proof in the underlying case within a case is diminished or is its presentation subject to relaxed evidentiary standards.

An excerpt from the transcript, though lengthy, will illustrate how the LeTourneaus were allowed to prove an engineering defect in the road and the inadequacy of advance warning through the opinion of a non-expert, Dickerson:

> "So, what our expert was going to say is that when Mr. LeTourneau was driving, he started on this surface right here [referring to photograph shown to jury], and then proceeded, and then eventually he contacted a point that was built up where asphalt was actually laid.

11

"And so, if we go to—okay. Here we go. So, basically what our expert was going to say and what his opinions were was that Mr. LeTourneau was approaching this area.

"Now, you can't see it in this photo, but, essentially, what the expert's opinion was was back before this asphalt overlay you went from this milled surface and then it transitioned into this built up surface or surface.

"And what our expert was going to say was that this height differential here was, approximately, two inches. And one of his core opinions was that that two inches may be safe for cars, but it's really dangerous for motorcycles, because, if you come off one edge and then you try to come back up, it's not as stable as a car.

"It's almost like hitting a curb for lack of a better term with your motorcycle and because you're only on two wheels you don't have the same stability that a car does. That's one of the things he said that he was going to say.

"The other thing is he was going to say that there should have been what we call channelling devices here. And what we mean by that is you see how there's, you know, the hashes that demarcate the middle of the road.

"Well, what he was going to say is you had to do something here to demarcate this edge of the road because this incident happened at night, and it was the fourth accident on this particular stretch of road.

"Now, there's a couple ways that our expert was going to say you could do that. One of the ways is you could put down tape or you can put down cones.

"So, in other words, you can just make the road like this and then everybody is only on that one portion. It gives a visual cue that you know that you are only supposed to go on this area of the road.

"What our expert was going to say based on what Mark testified at his deposition was that there was a cone like this right here. You see this tall cone. There was a cone like that, except when Mr. LeTourneau approached the area where this laid down asphalt

12

was, what he saw was this yellow here, which demarcated the left side of where he was going to be traveling, and this cone was actually located all the way over here on the shoulder.

"Now, it's pitch black at night. It's like 10:00 o'clock. So, what he sees, when he approaches, and where he's traveling is, approximately, in the middle of those two things.

"And so, our expert was going to say he was traveling right up here, because it's pitch black outside. He comes up onto this pavement. He doesn't know what's happening, because, you know, he's going, approximately, 50 miles an hour.

"This thing comes up fast, and he thinks this is the edge of the road, but it's not. This is the shoulder. And so, he hit right here. He went off the two-inch lip right here, tried to correct, but by then it was too late. He was thrown off his motorcycle, ended up in the road here, and his motorcycle ended up down here past this private drive.

"And so what Valenta [the LeTourneaus' designated engineering expert] was saying was, look, you need to have channelling devices or demarcation here, because if you just move this over, then when Mr. LeTourneau approaches, he's traveling on this safe area and there's no difference in pavement.

"He was also saying that there should have been additional warning signs based on the difference in pavement, like an uneven pavement sign or something like that. And so, essentially, it boiled down to warning signs, demarcation or channelling devices.

"His final opinion was you really didn't even have to do the road this way in construction at all. Essentially, what you could have done is what we call a mill-and-fill method, but basically they could have milled down the road and filled it in with asphalt all the way to the shoulder as they went, and then you don't have this, you know, condition at all present that would expose motorcyclists to danger. So, that's his opinions in a nutshell."

Expert reports from the medical doctor who was to opine about Mark LeTourneau's injuries and the long-term effects, the lifecare planner, and a damages

13

expert were introduced in a similar way—through Dickerson summarizing their reports. In addition, the jury was given a copy of the pretrial order summarizing the LeTourneaus' claims, essentially introduced as evidence of the truth of those claims. At one point Dickerson assured the jury, "each of our elements of damage were going to be supported *by some sort of evidence*, whether that be testimony or whether it be a document." (Emphasis added).

And lest there be any doubt, Dickerson admitted during trial that an expert would be necessary "100 percent" at the personal injury trial to testify about whether or not overlay is done correctly, whether or not the signage was appropriate, whether a person needs medical care in the future and beyond, because that was not something that a normal person has knowledge of. He also agreed that most cases such as this boil down to which expert the jury is going to believe. And remember, one of the reasons he believed he was forced to settle was because of the unavailability of the experts they were relying on to make their case.

In testifying to expert reports he did not generate, Dickerson seemed to rely on the fact that an expert can base their opinion on "[t]he facts or data . . . perceived by or made known to the expert," and that "the facts or data *need not be admissible* into evidence in order for the opinion or inference to be admitted" if they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." (Emphasis added.) K.S.A. 2024 Supp. 60-458. The LeTourneaus repeatedly asserted that "it was permissible for Mr. Dickerson to rely on facts or data prepared by others, even if the underlying facts or data are inadmissible."

But at the same time, the statute also clearly states:  "Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference *unless the court determines that the probative value of such facts or data in assisting the jury to evaluate the expert's opinion substantially outweighs any prejudicial*

14

*effect*." (Emphases added.) K.S.A. 2024 Supp. 60-458. There is nothing in the record to indicate the district court determined that the probative value of the facts or data Dickerson relied upon—the underlying expert opinions—outweighed any risk of prejudice before allowing him to testify at length about the contents of the underlying expert reports. The sum total of the trial court's ruling on this issue was:

> "I think an expert can rely on another expert's opinion to form their own opinion. You can cross-examine on it, but—so then you get to say, well, assuming Mr. Miller was wrong—or Dr. Miller was wrong, then you're wrong. That happens all the time in court."

We disagree. Dickerson was not a subject matter expert on engineering studies, medical injuries, or damages so the ability to cross-examine him on those topics was hopelessly limited. Moreover, even if the court were to have found that the probative value outweighed the prejudice, such a finding would not have been supported under these facts. We fail to see how the admission of an expert's opinion in this case, without the ability to cross-examine the expert on their opinion, was anything but fatally prejudicial. Given that the LeTourneaus built their legal malpractice case entirely on Dickerson's testimony, we can easily conclude that allowing the experts' opinions to be introduced through his testimony did not comport with the requirements of the statute.

And equally as concerning, Dickerson was allowed to tell the jury about evidence that had been specifically *excluded* from jury consideration in the underlying personal injury trial through a pretrial motion in limine. He was able to advise the jury that there had been three other motorcycle wrecks along that stretch of road within five days of each other, one involving a fatality, each somehow involving uneven pavement. However, the judge found that only one was similar enough to this incident to be allowed into evidence in the personal injury trial (and it was not the fatality). Yet because of the loose demarcation between the personal injury trial and the legal malpractice claims, the

15

jury was able to consider evidence it would not have even been able to hear in the underlying case.

In sum, we know of no court that would allow an attorney to simply review an expert's report on engineering studies, future earnings, and medical injuries and then opine in front of the judge or jury in a personal injury action. *Power Control Devices* primarily addressed whether expert testimony was necessary in a legal malpractice case to prove the merits of the underlying case. The Court of Appeals panel held that it was. 56 Kan. App. 2d at 702 (affirming entry of judgment as a matter of law). In fact, the court acknowledged that allowing the plaintiffs in the case to prove legal malpractice by using their former attorney's testimony to establish the underlying breach of contract claim was "a dangerous path and one that the district judge repeatedly and properly criticized." 56 Kan. App. 2d at 700. The panel further explained that "in a legal malpractice action, an attorney's opinion of the case, the attorney's pleadings or filings in the case, or even the attorney's puffing about his or her abilities to prevail, *is not evidence* of any of the claims made in the underlying lawsuit." (Emphasis added.) 56 Kan. App. 2d at 700.

Accordingly, we find that the district court erred by allowing Dickerson to offer expert testimony about topics beyond his expertise as proof of the necessary elements of negligence, causation, and damages in the underlying personal injury claim.

*The district court erred in denying Defendants' motion for judgment as a matter of law.*

In their second issue, Defendants challenge the district court's denial of the motion for judgment as a matter of law, which was based, in part, on their failure to prove the underlying "'case within a case'" to support a legal malpractice claim. See *Power Control Devices*, 56 Kan. App. 2d at 691 (quoting *Canaan*, 276 Kan. at 120). This is inescapably intertwined with the first issue.

16

When ruling on a motion for judgment as a matter of law, the district court must resolve all facts and inferences that may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. The district court must deny the motion if reasonable minds could reach different conclusions based on the evidence. The appellate court must apply a similar analysis when reviewing the grant or denial of a motion for judgment as a matter of law. *Dawson v. BNSF Railway Co.*, 309 Kan. 446, 454, 437 P.3d 929 (2019).

As both the Defendants and the LeTourneaus note, establishing a prima facie claim for legal malpractice under Kansas law requires showing "'(1) the duty of the attorney to exercise ordinary skill and knowledge, (2) a breach of that duty, (3) a causal connection between the breach of duty and the resulting injury, and (4) actual loss or damage.'" *Canaan*, 276 Kan. at 120. But Kansas courts have long recognized an additional requirement, which is that "[i]n addition to those four elements, to prove legal malpractice in the handling of litigation, a plaintiff must establish the validity of the underlying claim by showing that it would have resulted in a favorable judgment in the underlying lawsuit had it not been for the attorney's error." 276 Kan. at 120 (citing *Webb v. Pomeroy*, 8 Kan. App. 2d 246, 249, 655 P.2d 465 [1982]).

The LeTourneaus attempt to downplay this additional requirement by arguing that it is "nothing more than a 'but for' causation" rule, which requires showing that "'but for the negligence of the attorney-defendant, the outcome of the underlying lawsuit would have been successful.'" *Rice v. Barker & Bunch, P.C.*, 25 Kan. App. 2d 797, 797-98, 972 P.2d 786 (1998). But again, as this court recognized in *Power Control Devices*, this additional requirement is commonly referred to as "'a case within a case'" because "the plaintiff must present the case as it would have been presented separately to a judge or jury and the fact-finder must make a determination solely on the evidence presented regarding that underlying case." 56 Kan. App. 2d at 702.

17

Although the parties trade arguments on appeal about whether the LeTourneaus met this requirement, resolving this issue ultimately comes to a single question—the one we already determined in Defendants' first issue on appeal: Can a party bringing a legal malpractice claim prove their underlying personal injury case would have been successful based entirely on testimony from an attorney with no subject matter expertise in anything other than legal malpractice? No.

The underlying personal injury lawsuit was based in negligence, which required proving four basic elements: (1) a duty owed to the plaintiff by the defendant, (2) a breach of that duty, (3) causation between the breach of the duty and injury to the plaintiff, and (4) damages suffered by the plaintiff. *Shirley*, 297 Kan. 888, Syl. ¶ 4.

It is particularly telling that Dickerson believed he could not succeed in this case without the testimony of the expert witnesses, forcing him to recommend settlement. Yet the LeTourneaus seek to do just that by proving their underlying negligence claim without the testimony of those same expert witnesses. As we have already stated, at the personal injury trial Dickerson would not have been allowed to bootstrap in the expert testimony through simply reading their reports and summarizing their contents. If that were the case, there would be no reason for him to settle.

We find that no reasonable mind would conclude that there was sufficient evidence, absent the expert testimony from Dickerson that we have found should have been excluded, to support the underlying personal injury negligence claim. Because the proof of the personal injury negligence claim (which required proof of negligence, causation, and damages) was a prerequisite to the legal malpractice claim here, the district court erred in denying Defendants' motion for judgment as a matter of law. Accordingly, we reverse the judgment of the district court and remand with directions to enter judgment as a matter of law in favor of Defendants.

18

Because our holding on the first two issues is dispositive, it is unnecessary to reach the other issues raised by Defendants, and we offer no opinion as to their merits.

Reversed and remanded with directions.